**MILLS ACQUISITION CO., a Delaware Corporation, et al., Plaintiffs Below, Appellants,**

v.

**MACMILLAN, INC., a Delaware Corporation, et al., Defendants Below, Appellees.**

Supreme Court of Delaware.

Submitted: Nov. 2, 1988.
Oral Decision: November 2, 1988.
Written Opinion: May 3, 1989.

Rodman Ward, Jr. (argued), Keith R. Sattesahn, and Andre G. Bouchard, of Skadden, Arps, Slate, Meagher & Flom, Wilmington, Stuart L. Shapiro, of Skadden, Arps, Slate, Meagher & Flom, New York City, of Counsel, Thomas J. Dougherty, George J. Skelly, and Dennis M. Kelleher, of Skadden, Arps, Slate, Meagher & Flom, Boston, Mass., of counsel, for appellants.

Joseph A. Rosenthal, of Morris, Rosenthal, Monhait & Gross, P.A., Wilmington,

Richard Bemporad (argued), of Lowey, Dannenberg & Knapp, P.C., New York City, of counsel, Wolf, Popper, Ross, Wolf & Jones, New York City, of counsel; Ronald Litowitz, of Bernstein, Litowitz, Berger & Grossman, New York City, of counsel, for appellants.

A. Gilchrist Sparks, III (argued), and Lawrence A. Hamermesh, Esquire, of Morris, Nichols, Arsht & Tunnell, Wilmington, Bernard W. Nussbaum, of Wachtell, Lipton, Rosen & Katz, New York City, of counsel, for appellees.

E. Norman Veasey, R. Franklin Balotti, Esquire, and Nathan B. Ploener, of Richards, Layton & Finger, Wilmington, Dennis J. Block (argued), Greg A. Danilow, Richard L. Levine, David J. Berger, and Timothy B. Parlin, of Weil, Gotshal & Manges, New York City, of counsel, for appellees.

Robert K. Payson, and Michael D. Goldman, of Potter, Anderson & Corroon, Wilmington, Charles E. Koob (argued), Mark G. Cunha, Gregory A. Ritter, Nicholas Even, and Michael Isby, of Simpson, Thacher & Bartlett, New York City, of counsel, for appellees.

Before CHRISTIE, C.J., MOORE and HOLLAND, JJ.

MOORE, Justice.

In this interlocutory appeal from the Court of Chancery, we review the denial of injunctive relief to Mills Acquisition Co., a Delaware corporation, and its affiliates Tendclass Limited and Maxwell Communications Corp., PLC, both United Kingdom corporations substantially controlled by Robert Maxwell.[1] Plaintiffs sought control of Macmillan, Inc. ("Macmillan" or the "company"), and moved to enjoin an asset option agreement—commonly known as a "lockup"—between Macmillan and Kohlberg Kravis Roberts & Co. ("KKR"), an investment firm specializing in leveraged buyouts. The lockup was granted by Macmillan's board of directors to KKR, as the purported high bidder, in an "auction" for control of Macmillan.

Although the trial court found that the conduct of the board during the auction was not "evenhanded or neutral," it declined to enjoin the lockup agreement between KKR and Macmillan. That action had the effect of prematurely ending the auction before the board had achieved the highest price reasonably available for the company. Even though the trial court found that KKR had received improper favor in the auction, including a wrongful "tip" of Maxwell's bid by Macmillan's chairman of the board and chief executive officer, and that Macmillan's board was uninformed as to such clandestine advantages, the Vice Chancellor nevertheless concluded that such misconduct neither misled Maxwell nor deterred it from submitting a prevailing bid.

Given our scope and standard of review under *Levitt v. Bouvier*, Del.Supr., 287 A.2d 671, 673 (1972), we find that the legal conclusions of the trial court, refusing to enjoin the KKR lockup agreement, are inconsistent with its factual findings respecting the unfairness of the bidding process. Our decision in *Revlon, Inc. v. MacAndrews & Forbes Holdings, Inc.*, Del.Supr., 506 A.2d 173 (1986), requires the most scrupulous adherence to ordinary standards of fairness in the interest of promoting the highest values reasonably attainable for the stockholders' benefit. When conducting an auction for the sale of corporate control, this concept of fairness must be viewed solely from the standpoint of advancing general, rather than individual, shareholder interests. Here, the record reflects breaches of the duties of loyalty and care by various corporate fiduciaries which tainted the evaluative and deliberative processes of the Macmillan board, thus adversely affecting general stockholder inter-

---

**1.** Unless the context otherwise indicates, the plaintiffs will be referred to collectively as "Maxwell".

ests. With the divided loyalties that existed on the part of certain directors, and the absence of any serious oversight by the allegedly independent directors, the governing standard was one of intrinsic fairness. *Weinberger v. UOP, Inc.,* Del.Supr., 457 A.2d 701, 710–11 (1983). The record here does not meet that rigorous test, and the Court of Chancery failed to apply it. We take it as a cardinal principle of Delaware law that such conduct of an auction for corporate control is insupportable. Accordingly, we reverse.[2]

## I.

The lengthy factual background and evolution of the present battle for control of Macmillan are found in earlier opinions of the trial court. *See Robert M. Bass Group, Inc. v. Evans,* Del.Ch., 552 A.2d 1227 (1988) (*Macmillan I*); *Mills Acquisition Co. v. Macmillan, Inc.,* C.A. No. 10168, 1988 WL 108332 (October 17, 1988) (Macmillan II). However, a detailed review of certain major and other salient facts is essential to a proper understanding and analysis of the issues, and the context in which we address them.

Macmillan is a large publishing, educational and informational services company. It had approximately 27,870,000 common shares listed and traded on the New York Stock Exchange. In May, 1987, Macmillan's chairman and chief executive officer, Edward P. Evans, and its president and chief operating officer, William F. Reilly, recognized that the company was a likely target of an unsolicited takeover bid. They began exploring various defensive

measures, including a corporate restructuring of the company. The genesis of this idea was a plan undertaken by another publishing company, Harcourt Brace Jovanovich, Inc., to defeat an earlier hostile bid by Robert Maxwell in May, 1987.[3] *See Macmillan I,* 552 A.2d at 1229. Indeed, Macmillan's management began exploring such a recapitalization or restructuring just one day after the public announcement of Harcourt's plan.[4] *See* 552 A.2d at 1229.

As the Vice Chancellor noted in *Macmillan I,* for one year following the initial study of management's proposed restructuring plans:

two central concepts remained constant. First Evans, Reilly and certain other members of management would end up owning absolute majority control of the restructured company. Second, management would acquire that majority control, not by investing new capital at prevailing market prices, but by being granted several hundred thousand restricted Macmillan shares and stock options.

*Id.* at 1229.

Management's plan was to "exchange" these options and shares granted by the company into "several million shares of the recapitalized company." *See id.* at 1229–30 & n. 5. In addition, a Macmillan Employee Stock Option Plan ("ESOP") would purchase, with borrowed funds provided by the company, a large block of Macmillan shares. The then-existing independent ESOP trustee would be replaced by Evans, Reilly, Beverly C. Chell, Vice President, General Counsel, and Secretary, and John

---

**2.** We announced our decision in open court following oral argument on November 2, 1988, with the proviso that this more detailed opinion would follow in due course. For a complete transcript of that ruling, *see Mills Acquisition Co. v. Macmillan, Inc.,* 1 Mergers and Acquisitions L.Rep. No. 4 at 918–920 (Dec.1988).

**3.** *See British Printing & Communications Corp. v. Harcourt Brace Jovanovich, Inc.,* 664 F.Supp. 1519 (S.D.N.Y.1987).

**4.** Evans and Reilly consulted the same lender and investment banker involved in the Harcourt

restructuring, Morgan Guaranty & Trust Company and The First Boston Corporation, respectively. *See Macmillan I,* 552 A.2d at 1229. In February, 1988, a group of First Boston bankers formed their own firm, Wasserstein, Perella & Co., Inc. Wasserstein, Perella was similarly retained to represent Macmillan along with First Boston. After the retention of Wasserstein, Perella by management, it appears that First Boston's role was a mere formality, as they had little, if any, discernible involvement thereafter.

D. Limpitlaw, Vice President—Personnel and Administration. *Id.* at 1230. This arrangement would have given these persons voting control over all of the unallocated ESOP shares.

At a meeting held on June 11, 1987, the Macmillan board authorized the above transactions. During the pendency of *Macmillan I*, the directors maintained that no relationship existed between the management-proposed restructuring and the June 11 approval of the ESOP transactions along with the grant of options and restricted shares to management. In rejecting this claim the Vice Chancellor observed that "[i]f the directors were unaware of the implications of their actions for the restructuring, it can only be because management failed appropriately to disclose those implications." *Id.* at 1230 n. 7. This apparent domination of the allegedly "independent" board by the financially interested members of management, coupled with the directors' evident passivity in the face of their fiduciary duties, which so marked *Macmillan I*, continued unchanged throughout *Macmillan II.*

After the June 11 board meeting, management initiated various anti-takeover measures, including new lucrative severance contracts, known as "golden parachute" agreements, for several top executives in the event of a hostile takeover. Earlier, at the June 11 meeting, the board had approved generous five year "golden parachute" agreements for Evans and Reilly. The board also approved the adoption of a rights plan, commonly known as a "poison pill", from which the management-controlled ESOP was exempted. *Id.* at 1230–31 & n. 9.

Until August, 1987, the restructuring plan contemplated a "one company" surviving entity. This concept was changed, however, to provide for the company to be split into two distinct and separately traded parts: the Information business ("Informa-

tion") and the Publishing business ("Publishing"). *Id.* at 1231. Many "business related" reasons were advanced by management for the two company concept. It appears, however, that the real reason for this move was to greatly enhance management's control over the entities, thus making a hostile acquisition even more difficult. *See id.* at 1231 & n. 10.

As initially planned, Information would trade two classes of common stock. One class, wholly owned by management, would be entitled to ten votes per share (constituting absolute voting control). *Id.* at 1231. The second class would have one vote per share and would be held by the public stockholders. The management owned shares were all to be deposited in a voting trust designating Evans as the sole voting trustee. Further, Information would hold a "blocking preferred" stock in Publishing (constituting 20% of Publishing's voting power). *Id.*

At the September 22, 1987 board meeting the directors were informed of the new two company restructuring concept, including its anti-takeover features and management's substantial voting and equity participation in Information. The board approved the plan without objection.[5] *Id.* at 1231–32.

On October 21, 1987, the Robert M. Bass Group, Inc., a Texas corporation controlled by Robert M. Bass, together with certain affiliates (hereafter collectively, "the Bass Group" or "Bass"), emerged as a potential bidder. By then, Bass had acquired approximately 7.5% of Macmillan's common stock. Management immediately called a special board meeting on October 29, where a rather grim and uncomplimentary picture of Bass and its supposed "*modus operandi*" in prior investments was painted by management. Bass was portrayed, among other things, as a "greenmailer." *Id.* at 1232. At the meeting, the previously adopted poison pill was modified to reduce

---

**5.** In addition, the board granted options to management to purchase 202,500 shares of Mac-

millan at an exercise price of $74.24 per share. 552 A.2d at 1232.

the "flip-in" trigger from 30% to 15%.[6] *Id.*

In its decisions the Macmillan board completely relied on management's portrayal of Bass. As it turned out, and the Vice Chancellor so found in *Macmillan I*, management's characterization of the Bass Group, including most if not all of the underlying "factual" data in support thereof, was "less than accurate." *Id.* at 1232 & n. 15. Indeed, it was false. As the Vice Chancellor found: "[t]here is ... no evidence that Macmillan management made any effort to accurately inform the board of [the true] facts. On the present record, I must conclude (preliminarily) that management's pejorative characterization of the Bass Group, even if honestly believed, served more to propagandize the board than to enlighten it."[7] *Id.* at 1232.

As the Bass Group increased its holdings in the company, the Macmillan board's executive committee, at the behest of management, examined two charts (initially) outlining the proposed restructuring. The first chart contemplated management's ownership in Information at 50.6%. The second chart, prepared two days later, increased Evans, Reilly and Chell's share to 60%. The committee studied other such charts at a later date, but according to the Vice Chancellor: "[a]ll restructuring proposals clearly contemplated that management would own an absolute majority of Information's stock." *Id.* at 1233.

At a regularly scheduled board meeting on March 22, 1988, the Macmillan directors voted to: (1) grant 130,000 more shares of restricted stock to Evans, Reilly, Chell and Charles G. McCurdy, Vice President—Corporate Finance; (2) seek shareholder approval of a "1988 stock option and incentive plan" and the issuance of "blank check" preferred stock "having disparate voting rights;" (3) increase the directors' compensation by some 25% per year; and (4) adopt a "non-Employee Director Retirement Plan."[8] *Id.*

Due to the significant financial interests of Evans, Reilly, Chell, McCurdy and other managers in the proposed restructuring, management decided in February or March to establish a "Special Committee" of the Board to serve as an "independent" evaluator of the plan. The Special Committee was hand picked by Evans, but not actually formed until the May 18, 1988 board meeting. *See id.* This fact is significant because the events that transpired between the time that the Special Committee was conceived and the time it was formed illuminate the actual working relationship between management and the allegedly "independent" directors. It calls into serious question the actual independence of the board in *Macmillan I and II.*

As the Vice Chancellor observed, starting in April, 1988, Evans and others in management interviewed, and for four weeks thereafter maintained intensive contact with, the investment banking firm of Lazard Freres & Co. ("Lazard"), which was

6. A "flip-in" poison pill is one which grants shareholders additional financial rights in the target corporation when the pill is triggered by a cash offer or a large acquisition of target shares—here a threshold level of 15%. *See* R. Hamilton, *Fundamentals of Modern Business,* 559 (1989); L. Solomon, D. Schwartz, J. Bauman, *Corporations Law & Policy,* 330 (Supp. 1986).

7. Further, the Vice Chancellor found that "[n]either management nor the board engaged in a reasonable investigation of the Bass Group, as required by *Unocal* [*Corp. v. Mesa Petroleum Co.,* 493 A.2d 946 (Del.Supr., 1985) ]." 552 A.2d at 1240. Management's characterization of Bass is belied by testimony to the contrary of some of the Macmillan managers themselves. Ironically, after Bass' interest in Macmillan became known, Evans himself had contacted Robert Bass and expressed an interest in joining Bass in his investment in Bell & Howell and other transactions. *Id.* at 1240 n. 32.

8. Under this plan, all directors aged sixty years or older who had served on the Macmillan Board for at least five years (constituting seven of the eleven non-management directors) would be paid lifetime benefits equal to the directors' fees being paid at the time of "termination." In addition to the seven directors who would immediately qualify, three of the five members of the Special Committee who were considering the restructuring would also instantly qualify. Under this plan, as later amended, benefits also were to be paid to surviving spouses of board members. 552 A.2d at 1234.

to eventually become the Special Committee's financial advisor. *Id.* On April 14 representatives of Lazard met alone with Evans, and later with Evans, Chell and McCurdy. A few days later, Evans, Reilly, Chell, McCurdy and Samuel Bell, a Macmillan executive, again met with Lazard. All of these meetings involved extensive discussions concerning the proposed recapitalization. *Id.*

Thus, the Vice Chancellor found that "[i]n total, Lazard professionals worked with management on the proposed restructuring for over 500 hours before their 'client', the Special Committee, formally came into existence and retained them." *Id.* at 1233–34. *Further,* the restructuring plan that was presented to Lazard was chosen by Evans alone—with management owning 55% of the planned Information company. *Id.* at 1233.

On May 17, the day before the Macmillan annual stockholders' meeting, Evans received a letter from the Bass Group offering to purchase, consensually, all of Macmillan's common stock for $64 per share. The offer was left open for further negotiation. On May 18, the annual meeting was held at which the board recommended, and the shareholders approved, the previously mentioned 1988 Stock Option Plan and the "blank check" preferred stock. The Bass offer was not disclosed to the shareholders, although Bass had made the offer public in a filing with the Securities and Exchange Commission, which occurred simultaneously with the delivery of Bass' offer to Evans. *Id.* at 1234.

The Macmillan board convened immediately after the shareholders' meeting. Evans disclosed the Bass offer to the board. He then described the proposed restructuring, including the management group's planned equity position in Information. Thereafter, the Special Committee was selected.[9] However, the Committee was not given any negotiating authority regarding the terms of the restructuring. Evans apparently designated himself to "negotiate" that matter with the board.

At this May 18 meeting, the directors also amended the earlier "golden parachute" agreements; authorized a $125 million mortgage on Macmillan's building in New York City in order to finance the contemplated restructuring; and further amended the "Retirement Plan" to include severance benefits for *spouses* of directors. *Id.* However, the board deferred discussion of the Bass proposal.

The Special Committee remained dormant for one week following its formation, and met for the first time on May 24, 1988. Before its first meeting, Evans and Reilly again met with Lazard, allegedly the Special Committee's advisor, and Wasserstein, Perella, apparently to discuss the recapitalization plan. Evans, Reilly, Chell and McCurdy attended the May 24 Special Committee meeting, at which Lazard, as financial advisor, and the law firm of Wachtell, Lipton, Rosen & Katz were formally retained, having been invited to the meeting by Evans.[10] Significantly, Evans and his management colleagues did not inform the Committee of their substantial prior discus-

---

9. The Special Committee consisted of Lewis A. Lapham, an old college classmate of Evans' father, (Chairman), James H. Knowles, Jr., Dorsey A. Gardner, Abraham L. Gitlow and Eric M. Hart. Hart failed to attend a single meeting of the Committee. 552 A.2d at 1234 n. 20.

10. It appears that none of the committee members had even met with the advisors before the May 24 meeting. The method by which the advisors to the Special Committee was chosen is quite revealing. While the chairman, Mr. Lapham, remembered little about the matter, it is clear that Evans, Chell, and a Pittsburgh lawyer, Charles J. Queenan, Jr., directed the choices. Mr. Knowles of the Committee testified:

Q. Who invited representatives of the Wachtell firm to the May 24th meeting of the special committee?

A. I believe that decision would have been made by—it was a name that was suggested at the board meeting in the presence of the outside directors and it was one of several names I suppose that was considered to be invited. I know—I have personal knowledge that Chuck Queenan, of Kirkpatrick Lockhart was asked to participate in the selection. That—Kirkpatrick is [sic] law firm I happen to know and respect. That is the extent of my knowledge. Of course, I'm well aware of Wachtell activities, so I have—

sions with Lazard over the preceding month.[11] One of the outside directors, Thomas J. Neff, testified that if he had known of the extent of the activities between Lazard and management, it would have raised "serious doubts" concerning Lazard's independence. *Id.* at 1234–1235 & n. 22. The restructuring plan, including management's proposed 55% ownership of Information, was presented to the Committee, which then directed Lazard to "evaluate" it further, along with the Bass offer.

Concurrent with the Special Committee meeting of May 24, Evans directed McCurdy to meet with John Scully, a Bass representative, that same day in Chicago. As the Vice Chancellor found, however, "Evans [had so] limited McCurdy's authority as to make it a foregone conclusion that the meeting would yield no meaningful result." *Id.* at 1235. In fact, the Vice Chancellor termed the meeting "little more than a charade", *Id.* at 1240, since McCurdy's only mission was to tell Scully that "Evans wanted the Bass Group to go away." *Id.*

at 1235. The Vice Chancellor also observed that "[m]anagement ... had no desire to negotiate. They chose to close their eyes and to treat the Bass offer as firm and unalterable. *The Board and the Special Committee followed in lockstep. Neither took reasonable efforts to uncover the facts." Id.* at 1240–41. (Emphasis added).

Notwithstanding this fruitless approach, Scully, Bass' representative, explained the background of the prior Bass investments about which the Macmillan board had been misinformed. Scully even offered to make other Bass representatives available to resolve these concerns. However, Scully's offer was never accepted, and the May 24 meeting was the only time that a Macmillan representative would meet with a Bass delegate until after the final board approval of the restructuring on May 30. *Id.* at 1235.

At the May 27 Macmillan board meeting, McCurdy reported on his meeting with Scully. The Vice Chancellor found that

---

Q. Despite that you selected them as counsel to the special committee?
A. Yes.
Q. Mr. Queenan is a partner in the Pittsburgh office of the Kirkpatrick firm?
A. Yes.
Q. You stated that you have personal knowledge that Mr. Queenan was asked for his advice as to special counsel?
A. That's correct.
Q. What is the nature of that personal knowledge?
A. I asked Beverly, "Have you talked to Chuck Queenan about who will represent the outside directors?" And she said that she had and that they would and that he concurred with the decision to ask Wachtell. We had first determined, of course, whether any conflicts of interest existed and there were not.
Q. By Beverly you mean Ms. Chell?
A. Ms. Chell, yes.
 *   *   *   *   *   *
Q. What did you say in this phone conversation and what did she say?
A. I said, will you or have you discussed this matter with Chuck Queenan and she said that she had and she would and that his recommendation would be Wachtell, assuming there were no conflict [sic] of interest.
Q. By "this matter," you mean the retention of counsel to the special committee?
A. That's correct. You have to understand that I have a great deal of respect for Queenan

and I view him as one of the sharpest corporate lawyers in Pittsburgh and I expect him to keep me out of harm's way with the best possible advice.
 *   *   *   *   *   *
Q. Who invited the representatives of Lazard Freres to the May 24th meeting of the special committee?
A. On May 18th, I believe Herman Schmidt [a Macmillan director not on special committee] stated that the independent committee should have its own independent investment banking advisor. My recollection is that Mr. Evans said that he had already had a preliminary discussion with Lazard ...
Mr. Queenan is also the lawyer who was identified as being present on the evening of September 26 when Evans tipped Maxwell's bid to KKR. *See also* n. 26.

**11.** Thus, Mr. Lapham, the chairman of the committee testified:
Q. Did you have any conversation with Mr. Evans concerning Lazard Freres before they were retained by the special committee?
A. No.
Q. Before Lazard Freres was retained by the special committee, did any person tell you that Lazard Freres had been performing certain services with respect to the restructuring before the retention?
A. No, I don't remember that.

"[a]t least one director developed the misimpression from McCurdy's report that McCurdy had tried unsuccessfully to get Scully to amplify or clarify the terms of the Bass offer." *Id.*

The Special Committee met on May 28 to hear Lazard's presentation. Evans, Reilly, Chell and McCurdy attended. *Id.* at 1235 n. 23. Lazard reported that management would ultimately own 39% of Information, instead of the previous 55%. This reduction occurred, ostensibly, to prevent the restructuring from being "regarded as a transfer of corporate control from the public shareholders to management." *Id.* at 1235. The Vice Chancellor found, however, that: "[d]ocuments internally generated by Macmillan reported that the management group would have effective control over Information even with less than 50% of its stock." *Id.* at 1242–43. In addition: "the conclusion that effective control will pass to management is consistent with the intent and historical evolution of the restructuring which, in every proposed permutation, had management owning over 50% of Information." [12] *Id.* at 1243.

Macmillan's financial advisors valued the recapitalization at $64.15 per share. Lazard valued Macmillan at $72.57 per share, on a pre-tax basis, but advised the "independent" directors that it found the restructuring, valued at $64.15 per share, to be "fair." Lazard also recommended rejection of the $64 Bass offer because it was "inadequate." Wasserstein, Perella valued Macmillan at between $63 and $68 per share and made the same recommendations as Lazard concerning the restructuring and the Bass offer. All of these valuations will gain added significance in *Macmillan II.*

On the Special Committee's recommendation, the Macmillan board adopted the restructuring and rejected the Bass offer. The committee, however, had not negotiated any aspect of the transaction with management. *Id.* at 1236.

On May 31, Macmillan publicly announced the May 30 approval of the restructuring. This was the first disclosure to the shareholders of Evans' plans to significantly benefit himself and others in management at the stockholders' expense.

The restructuring that was approved, and later preliminarily enjoined, treated the public shareholders and the management group differently. In exchange for their Macmillan shares, the public stockholders were to receive a dividend of $52.35 cash, a $4.50 debenture, a "stub share" of Publishing ($5.10) and a one-half share of Information ($2.20). The management group, and the ESOP, would not receive the cash and debenture components. Instead, they would "exchange" their restricted stock and options for restricted shares of Information, representing a 39.2% stake in that company. *Id.*

The Information stock received by management could not be sold, pledged, or transferred for two years, and would not fully vest for five years. The management holders could, however, vote the shares and receive dividends. Management would also own 3.2% of Publishing. The ESOP would own 26% of Publishing. [13] *Id.*

The effect of all this would increase management's then-combined holdings of 4.5% in Macmillan to 39% in Information. Additionally, management would receive substantial cash and other benefits from the transaction. *See id.* at 1237 n. 28.

---

**12.** In concluding that the restructuring represented an effective change in control the Vice Chancellor stated that: "[t]he change, then, was one of form, not substance, a conclusion supported by charts prepared for the Board on May 27, 1988, which stated that management would obtain 'voting control' over Information even with a block of less than 50%." 552 A.2d at 1243. The court characterized the transaction as a "windfall to management at the expense of Macmillan's public shareholders." *Id.* at 1246.

**13.** Although the *Macmillan I* opinion did not further discuss this point, it appears that the combination of the ESOP and management holdings, along with the 20% "blocking preferred" that Information holds in Publishing, would give management effective control over Publishing as well.

Following the board's public announcement on May 31, the Bass Group made a second offer for all Macmillan stock at $73 per share. In the alternative, Bass proposed a restructuring, much like the one the board had approved, differing only in the respect that it would offer $5.65 per share more, and management would be treated the same as the public stockholders.[14]

Two days after the revised offer was announced, Lazard concluded that it could furnish an 'adequacy' opinion that would enable the Special Committee to reject the $73 per share cash portion of Bass' offer. They gave an oral opinion the following day, June 7, at a joint meeting of the Special Committee and the board that the Bass $73 cash offer, as distinguished from Bass' alternative restructuring proposal, was inadequate, given Lazard's earlier opinion that the "pre-tax break up" value of Macmillan was between $72 and $80 per share. Wasserstein, Perella expressed a similar opinion, having previously valued the company at between $66 and $80 per share. *Id.* at 1237–38. These valuation ranges, obviously intended to accord with management's restructuring in *Macmillan I*, will assume an interesting significance in *Macmillan II*, when less than three months later, on August 25, these same advisors, at Evans' behest, found Maxwell's $80 all cash offer inadequate.

Upon the Special Committee's recommendation, the board again rejected the revised Bass offer and reaffirmed its approval of the management restructuring. It is noteworthy that Bass' alternative restructuring proposal was never determined to be financially inadequate or unfair by Lazard or Wasserstein, Perella. *Id.* at 1238.

However, after suit was filed in *Macmillan I*, and in an apparent effort to lessen the appearance of impropriety surrounding the restructuring, Evans, Reilly, Chell and McCurdy agreed in writing that "they would vote Information shares for a slate of nominees, a majority of which are independent directors." *Id.* at 1238 n. 29. However, the Vice Chancellor noted that "the record indisputably shows that these individuals have always acted in unison, and that Reilly, Chell, and McCurdy will have strong incentives to remain on good terms with Evans, who would be their immediate supervisor and Information's largest single stockholder." *Id.* at 1245. Further, "the undertaking to elect independent directors has been carefully drafted, so that its terms would permit the management group to select directors that might not act independently of management, but would prevent the selection of directors who would be likely to act independently." [15] *Id.*

On July 14, 1988, the Vice Chancellor preliminarily enjoined the Evans designed restructuring, and held that both of the revised Bass offers were "clearly superior to the restructuring." The Court further inferred that the only real "threat" posed by the Bass offers was to the incumbency of the board "or to the management group's expectation of garnering a 39% ownership interest in Information on extremely favorable terms." [16] *Id.* at 1241 & n. 34.

---

**14.** The Vice Chancellor determined that "[t]here is no evidence that any member of the Board or the Special Committee questioned how a sale of 39% of Information would constitute a sale of the company if sold to the Bass Group, yet would not be if that same 39% interest is sold to the management group. The defendants have failed to explain that reasoning, and its logic continues to elude the Court." 552 A.2d at 1242.

**15.** The definition, given in the written undertaking, of the term "independent director" would, in the Vice Chancellor's opinion "enable the management group to nominate officers or oth-

er employees of Publishing or close personal friends of the management group...." 552 A.2d at 1245 n. 40.

**16.** Consistent with the trial court's strong implication that any "threat" posed by the Bass offer was being used merely as a pretext, the court found that "management was ... able to use the 'threat' posed by the Bass offers to '[avail] themselves of the takeover threat to increase their, and their employees' ownership interest in the company.'" 552 A.2d at 1243 & n. 38 (citations omitted).

Thus, *Macmillan I* essentially ended on July 14, 1988. However, it only set the stage for the saga of *Macmillan II* to begin that same day. It opened with Macmillan's senior management holding extensive discussions with KKR in an attempt to develop defensive measures to thwart the Bass Group offer. This included a management-sponsored buyout of the company by KKR. There is nothing in the record to suggest that this was done pursuant to board action. If anything, it was Evans acting alone in his own personal interest.

Within a few hours after the Court of Chancery issued its preliminary injunction, Evans and Reilly formally authorized Macmillan's investment advisors to explore a possible sale of the entire company. This procedure eventually identified six potential bidders.[17] That search process appears to have been motivated by two primary objectives: (1) to repel any third party suitors unacceptable to Evans and Reilly, and (2) to transfer an enhanced equity position in a restructured Macmillan to Evans and his management group. While these goals may not have constituted *prima facie* breaches of the duty of loyalty owed by senior management to the company and its shareholders, it is evident that such objectives undoubtedly led to the tainted process which we now confront.

On July 20, a most significant development occurred when Maxwell intervened in the Bass–Macmillan bidding contest by proposing to Evans a consensual merger between Macmillan and Maxwell at an all-cash price of $80 per share. This was $5.00 higher than any other outstanding offer for the company.[18] Maxwell further stated his intention to retain the company's management, and additionally, to negotiate appropriate programs of executive incentives and compensation.

Macmillan did not respond to Maxwell's overture for five weeks. Instead, during this period, Macmillan's management intensified their discussions with KKR concerning a buyout in which senior management, particularly Evans and Reilly, would have a substantial ownership interest in the new company. Upon execution of a confidentiality agreement, KKR was given detailed internal, non-public, financial information of Macmillan, culminating in a series of formal "due diligence" presentations to KKR representatives by Macmillan senior management on August 4 and 5, 1988.

On August 12, 1988, after more than three weeks of silence from the company, Maxwell made an $80 per share, all-cash tender offer for Macmillan, conditioned solely upon receiving the same nonpublic information which Macmillan had given to KKR three weeks earlier. Additionally, Maxwell filed this action in the Court of Chancery seeking a declaration that the Delaware Takeover statute, 8 *Del.C.* § 203, was inapplicable to the tender offer.[19]

Later that day, Evans received a letter from Maxwell confirming that he had initiated a tender offer, but also reiterating his desire to reach a friendly accord with Macmillan's management. Alternatively, Maxwell offered to purchase Information from the company for $1.1 billion. Significantly, no Macmillan representative ever attempted to negotiate with Maxwell on any of these matters. Notwithstanding the fact that on May 30 both Wasserstein, Perella and Lazard had given opinions that the management restructuring, with a value of $64.15, was fair, and on June 7 had advised

---

**17.** These entities were the Bass Group, Maxwell, KKR, Gulf & Western, McGraw–Hill and News–America Corp.

**18.** Two days before the initial Maxwell bid, the Bass Group had raised its offer for the company to $75 per share. Although this final Bass offer remained open into September, the entry of *Maxwell* into the fray, for all practical purposes, rendered the Bass bid academic.

**19.** Macmillan eventually conceded that 8 *Del.C.* § 203 was inapplicable to Maxwell's offer. Later, the complaint in the Court of Chancery was amended on September 15 seeking to enjoin use of Macmillan's "poison pill" against Maxwell.

the board that the company had a maximum breakup value of $80 per share, Wasserstein, Perella and Lazard issued new opinions on August 25 that $80 was unfair and inadequate. Accordingly, the Maxwell offer was rejected by the Macmillan board.

On August 30 a meeting was arranged with Maxwell at Evans' request at which Maxwell executed a confidentiality agreement, and was furnished with some, but not all, of the confidential financial information that KKR had received. At this meeting, Evans told Robert Maxwell that he was an unwelcome bidder for the whole company, but that a sale to Maxwell of up to $1 billion of Macmillan's assets would be considered. Undeterred, Maxwell indicated his intent and ability to prevail in an auction for the company, as "nobody could afford" to top a Maxwell bid due to the operational economies and synergies available through a merger of Maxwell's companies with Macmillan.

Nonetheless, on September 6, 1988, representatives of Macmillan and KKR met to negotiate and finalize KKR's buyout of the company. In this transaction Macmillan senior management would receive up to 20% ownership in the newly formed company. During this meeting, Evans and his senior managers suggested that they would endorse the concept and structure of the buyout to the board of directors, *even though KKR had not yet disclosed to Evans and his group the amount of its bid.* With this extraordinary commitment, KKR indicated that it would submit a firm offer by the end of the week—September 9. Following this meeting with KKR, Macmillan's financial advisors were instructed by Evans to notify the six remaining potential bidders, during September 7 and 8, that "the process seems to be coming to a close" and that any bids for Macmillan were due by Friday afternoon, September 9. It is particularly noteworthy that Maxwell was given less than 24 hours to prepare its bid, not having received this notification until the night of September 8.

In a September 8 meeting with Robert Maxwell and his representatives, Evans announced that the company's management planned to recommend a management-KKR leveraged buyout to the directors of Macmillan, and that he would not consider Maxwell's outstanding offer despite Maxwell's stated claim that he would pay "top dollar" for the entire company. Evans then declared that now he would only discuss the possible sale of up to $750 million worth of assets to Maxwell in order to facilitate this buyout. Furthermore, Evans flatly told Maxwell that senior management would leave the company if any other bidder prevailed over the management sponsored buyout offer. Following this meeting, Robert Maxwell expressed his concern to Evans that no lockup or other "break up" arrangements should be made until Macmillan had properly considered his proposal. Additionally, he volunteered to either negotiate his offering price or to purchase Information for $1.4 billion, subject to a minimal due diligence investigation.

On the morning of September 9, Maxwell representatives were granted a limited due diligence review with respect to certain divisions of the company. However, during these sessions Macmillan provided little additional material information to Maxwell. Indeed, throughout the bidding process, and despite its repeated requests Maxwell was not given complete information until September 25—almost two months after such data had been furnished to KKR.

In the late afternoon of September 9, Evans received another letter from Robert Maxwell, offering to increase his all-cash bid for the company to $84 per share. This revised offer was conditioned solely upon Maxwell receiving a clear understanding of which managers would be leaving Macmillan upon his acquisition of the company. However, Maxwell ended this correspondence with the statement:

> If you have a financed binding alternative proposal which will generate a greater present value for shareholders, I will withdraw my bid.

In their deliberations that weekend, Macmillan's advisors inferred from this remark

that Maxwell was unwilling to bid over $84 per share for the company.

By 5:30 p.m. on September 9, two bidders remained in the auction: Maxwell, by virtue of his written $84 all-cash offer, and KKR, which had submitted only an oral bid to Macmillan's advisors. However, Macmillan representatives continued to negotiate overnight with KKR until an offer was reduced to writing on the next day, September 10, despite the bid deadline previously mandated by the company. In their written bid, KKR offered to acquire 94% of Macmillan's shares through a management participation, highly-leveraged, two-tier, transaction, with a "face value" of $85 per share and payable in a mix of cash and subordinated debt securities. Additionally, this offer was strictly conditioned upon the payment of KKR's expenses and an additional $29.3 million "break up" fee if a merger agreement between KKR and Macmillan was terminated by virtue of a higher bid for the company.

On September 10 and 11, Macmillan's directors met to consider Maxwell's all-cash $84 bid and KKR's blended bid of $85. Although Macmillan's financial advisors discounted KKR's offer at $84.76 per share, they nevertheless formally opined that the KKR offer was both higher than Maxwell's bid and was fair to Macmillan shareholders from a financial point of view. The Macmillan board, inferring from Maxwell's September 9 letter that he would not top a bid higher than $84 per share, approved the KKR offer and agreed to recommend KKR's offer to the shareholders. The Macmillan–KKR merger agreement was publicly announced the following day, accompanied by Macmillan's affirmation that it would take all action necessary to insure the inapplicability of its shareholder rights plan, i.e., "poison pill," to the KKR offer.

Subsequently, on September 15—and in seeming contradiction to his September 9 statement that he would not top his previous offer—Maxwell announced that he was increasing his all-cash offer to $86.60 per share. Additionally, Maxwell asked the Court of Chancery to enjoin the operation of Macmillan's "poison pill" rights plan against the revised Maxwell offer.

After considering the increased Maxwell bid, on September 22 the Macmillan board withdrew its recommendation of the KKR offer to shareholders, and declared its willingness to consider higher bids for the company. The board therefore instructed its investment advisors to attempt to solicit higher bids from Maxwell, KKR or any other potential bidders, in an effort to maximize the company's value for shareholders. Additionally, the board directed that the shareholder rights plan be applied to all bidders in order to enhance the auction process.

On September 23, 1988, Wasserstein, Perella began establishing the procedures for submission of the Maxwell and KKR final bids. In partial deference to Maxwell's vocal belief that the auction would be "rigged" in KKR's favor, and in order to promote an appearance of fairness in the bidding process, a "script" was developed which would be read over the telephone to both KKR and Maxwell. According to this script, both bidders were called and advised on September 24 that "the process appears to be drawing to a close" and that any final amended bids were due by 5:30 p.m., September 26.

After receiving this information on September 24, Robert Pirie, Maxwell's financial advisor, once again expressed concern to Macmillan that KKR would be favored in the auction process, and would receive "break up" fees or a lockup agreement without Maxwell first being allowed to increase its bid. Perhaps as a result of this concern, Robert Maxwell stated unequivocally in a September 25 letter to Macmillan that he was prepared, if necessary, to exceed a higher competing offer from KKR.[20]

**20.** Later that day, Maxwell was finally given the additional financial information which KKR received in early August.

KKR had further discussions with Macmillan's advisors during the afternoon of September 25. One of the primary topics was an agreement that KKR's amended offer would include a "no-shop" clause. KKR's stated interpretation of this "blanket prohibition" was that disclosure by Macmillan of any element of KKR's bid, including price, would automatically revoke the offer.[21] Macmillan's advisors thus knew that KKR would insist upon conditions that could hinder maximization of the auction process to the detriment of Macmillan's shareholders.

On September 26, the Court of Chancery heard Maxwell's application for a temporary restraining order, seeking to prevent Macmillan from acting unfairly in the auction to be held later that evening. Although the Vice Chancellor observed that the auction process should be fair, he denied Maxwell's motion, based in part upon Macmillan's representation that there would be "no irrevocable scrambling of transactions" in the auction.

By the auction deadline on that evening, both Maxwell and KKR had submitted bids. Maxwell made an all-cash offer, consistent with its previous bids, of $89 per share. Like its past bids, KKR submitted another "blended", front-loaded offer of $89.50 per share, consisting of $82 in cash and the balance in subordinated securities. However, this nominally higher KKR bid was subject to three conditions effectively designed to end the auction: (1) imposition of the "no-shop" rule, (2) the grant to KKR of a lockup option to purchase eight Macmillan subsidiaries for $950 million, and (3) the execution of a definitive merger agreement by 12:00 noon, the following day, September 27.

While Macmillan's financial analysts considered the value of KKR's bid to be slightly higher, they decided that the bids were too close to permit the recommendation of either offer, and that the auction should therefore continue. However, shortly after the bids were received, Evans and Reilly, who were present in the Macmillan offices at the time, asked unidentified financial advisors about the status of the auction process. Inexplicably, these advisors told Evans and Reilly that both bids had been received, informed them of the respective price and forms of the bids, and stated that the financial advisors were unable to recommend either bid to the board.[22]

Thereafter, in the presence of Reilly and Charles J. Queenan, a Pittsburgh lawyer previously mentioned in note 10, *supra.*, but who did not appear before us in this action, Evans telephoned a KKR representative and "tipped" Maxwell's bid to him. In this call, Evans informed KKR that Maxwell had offered "$89, all cash" for the company and that the respective bids were considered "a little close." After a few minutes of conversation, the KKR representative realized the impropriety of the call and abruptly terminated it.[23]

Meanwhile, Macmillan's financial advisors, apparently ignorant of Evans' "tip" to KKR, began developing procedures for a supplemental round of bidding. Bruce Wasserstein, the leading financial advisor to Macmillan management, who primarily orchestrated the auction process, developed a second "script" which was to be read over the telephone to both bidders. It stated:

> We are not in a position at this time to recommend any bid. If you would like to

---

**21.** Although the trial court noted the seeming disparity between the actual contract terms and KKR's own interpretation of that language, for present purposes we accept KKR's assertion that the clause prohibited disclosure of any aspect of its bid.

**22.** This epitomizes the problem of conducting an auction without board oversight, and under uncontrolled circumstances that gave Evans and Reilly, themselves interested bidders with KKR, complete and improper access to the process.

**23.** In fairness to KKR even Maxwell concedes that but for the integrity of KKR's counsel, it is unlikely that Evans' tip would have been publicly disclosed. *See* transcript of oral argument at 1 Mergers & Acquisitions L.Rep. 855, 867, 903 (Dec.1988). It also appears that counsel, who appeared in this action for the defendants, were unaware of the "tip" until it was disclosed by KKR.

increase your bid price, let us know by 10:00 p.m.

At approximately 8:15 p.m., Wasserstein first read this prepared text to a Maxwell representative, and then relayed the same message to KKR. However, the actual document in evidence, which purports to be the "script", significantly varies in what was said to KKR. Allegedly in response to questions from KKR, Wasserstein and other financial advisors impressed upon KKR "the need to go as high as [KKR] could go" in terms of price. Additionally, the Wasserstein "script" discloses the further statement:

> To KKR: Focus on price but be advised that we do not want to give a lockup. If we granted a lockup, we would need: (1) a significant gap in your bid over the competing bid; (2) a smaller group of assets to be bought; and (3) a higher price for the assets to be bought.

At approximately 10:00 p.m., near the auction deadline of midnight, Pirie on behalf of Maxwell telephoned Wasserstein to inquire whether Macmillan had received a bid higher than the Maxwell offer. During the call, Pirie flatly stated that upon being informed that a higher bid had been received by Macmillan, Maxwell would promptly notify the company whether it would increase its standing offer. Pirie also said that if Maxwell had already submitted the highest bid for the company, he would not "bid against himself" by increasing his offer.

While Wasserstein could reasonably infer from this message that Maxwell intended to top any KKR offer, it is clear that Pirie wanted to know whether KKR had in fact submitted a higher bid. Wasserstein claims to have believed that such a revelation might violate KKR's "no-shop" condition, and would have terminated the KKR offer.[24] Therefore, he replied that if Maxwell had "anything further to say, tell us by midnight." Additionally, Wasserstein

told Pirie to assume that Macmillan would not call Maxwell to inform it of a higher offer. After this conversation, and upon the advice of legal counsel, Wasserstein called Pirie back and reemphasized that he was not in a position to recommend a bid to the Macmillan board, and that Maxwell should submit its highest bid to the company by 12:00 midnight.

From the bulk of these conversations, Maxwell and Pirie reasonably, but erroneously, concluded that Wasserstein was attempting to force Maxwell to bid against itself, and that its offer was indeed higher than the competing KKR bid. Furthermore, the record is clear that Wasserstein, who later acknowledged this fact to the Macmillan board, knew that Pirie mistakenly believed that Maxwell was already the high bidder for the company. Yet, despite his responsibilities as "auctioneer" for the company, Wasserstein never sought to correct Maxwell's mistaken belief that it had prevailed in the auction. The cumulative effect of all this was that Maxwell did not increase its bid before the Macmillan board met on the next day, September 27.

At 11:50 p.m., September 26, ten minutes before the bid deadline, KKR submitted a final revised offer with a face value of $90 per share. Furthermore, the bid was predicated upon the same three previous conditions—except that the revised lockup option, apparently reflecting the additional information relayed by Wasserstein in his special KKR "script," was reduced to include only four subsidiaries at a purchase price of $775 million.

In the early morning hours of September 27, after the midnight auction deadline, Macmillan negotiated with both parties over wholly different matters. Macmillan's advisors negotiated with Maxwell's representatives for several hours over the specific and unresolved terms of Maxwell's otherwise unconditional merger proposal. However, during these sessions Macmillan

---

**24.** At oral argument the parties, including KKR, could not seriously claim that disclosing the mere existence of a higher bid would violate the "no-shop" clause. However, *see* n. 21, *supra* and n. 31, *infra*.

never suggested that Maxwell increase its bid. On the other hand, for almost eight hours Macmillan and KKR negotiated to increase KKR's offer. By the next morning, while only increasing its total bid by approximately $1.6 million, to $90.05 ($.05 per share), KKR extracted concessions from Macmillan which increased KKR's exercise price under the lockup by $90 million after adding three more Macmillan divisions to the group of optioned assets.

Significantly, the sale of the assets under the KKR lockup agreement was structured on a "cash" basis, which would immediately result in a $250 million current tax liability for Macmillan. Moreover, both KKR and Macmillan knew that this tax liability could have been avoided through an "installment" basis sale of the assets. Above all, they knew that it would produce a *de facto* financial "poison pill" which would effectively end the auction process.

On the morning of September 27, the Macmillan board met with its investment advisors to consider these competing bids. During the course of the meeting, chaired by Evans and with Reilly present, the company's financial advisors with Wasserstein as the lead spokesman (some directors said he presided), made presentations describing their communications with both Maxwell and KKR during the auction process. Wasserstein falsely claimed that the advisors had conducted "a level-playing field auction where both parties had equal opportunity to participate." Additionally, in answer to questioning, Wasserstein mistakenly assured the board that he had been the "only conduit of information" during the process and, falsely, that both parties had received *identical* information during the auction. Despite the obvious untruth of these assertions, Evans and Reilly remained silent, knowing also that Evans had clandestinely, and wrongfully, tipped Maxwell's bid to KKR.

Wasserstein then announced the results of the second round of the auction along with the specific aspects of KKR's $90.05 "face amount" offer and Maxwell's $89 cash bid. Wasserstein, whose firm was originally retained as *management's* financial advisor, not the board's, then opined that the KKR offer was the higher of the two bids. The Lazard representative, who was retained as the financial advisor to the independent directors of the board, but throughout acquiesced in Wasserstein's predominant role, thereafter concurred in Wasserstein's assessment. Wasserstein additionally explained the ramifications of the conditions of KKR's offer, including the "deterrent" effect of the $250 million tax liability produced by the KKR lockup agreement.

However, through its deliberations on September 27, Macmillan's board, whether justified or not, was under the impression that the two bids were the product of a fair and unbiased auction process, designed to encourage KKR and Maxwell to submit their best bids.[25] The directors were not informed of Evans' and Reilly's "tip" to KKR on the previous day. Nor were they told of Wasserstein's extended "script" giving to KKR, but denying to Maxwell, additional information about the bidding process. Throughout the board meeting Evans and Reilly remained silent, deliberately concealing from their fellow directors their misconduct of tipping Maxwell's bid to KKR.[26]

After these presentations, the Macmillan directors held extensive and closed discussions concerning the choices available to the board, including the possibility that Maxwell might increase its bid if the board "shopped" the KKR offer. Yet, as they believed that the risk of terminating the KKR offer outweighed the potential advantage of an increased Maxwell bid, the directors decided to accept the higher face

---

**25.** Even though neither the Board as a whole, nor the allegedly "independent" directors, had taken any action to ensure such a process.

**26.** It also appears that the handwritten "official" minutes of the board meeting were taken by a partner of Charles J. Queenan, Jr., the Pittsburgh lawyer who was present when Evans tipped Maxwell's bid to KKR. *See also* n. 10.

value KKR proposal, and granted the KKR merger and lockup option agreements.

On the next day, Maxwell promptly amended its original complaint in the Court of Chancery, added KKR as a co-defendant, and among other things, sought to enjoin the lockup agreement, the break-up fees and expenses granted to KKR.

On September 29, 1988, KKR filed documents required by the Securities and Exchange Commission, amending its outstanding tender offer to reflect the increased $90.05 face amount bid accepted by the Macmillan board. In this filing, and for the first time, KKR disclosed Evans' September 26 "tip" to KKR that Maxwell's cash bid was $.50 lower than KKR's.

On that same day, Robert Maxwell delivered a letter to Evans announcing that he had amended his cash tender offer to $90.25 per share, conditioned upon invalidation of the KKR lockup agreement. In his letter, Maxwell emphasized that he had previously stated his willingness to top any offer higher than his earlier $89 offer, and that he was nevertheless willing to purchase for $900 million the same four divisions which KKR originally proposed to purchase for $775 million.

On October 4, the Macmillan board met to consider both the revised Maxwell bid and Evans' September 26 "tip" to KKR. After some discussion and deliberation, the board rejected Maxwell's increased offer because it was conditioned on invalidating the KKR lockup. Furthermore, the board considered that Evans' "tip" to KKR was immaterial in light of the second round of bidding that occurred. Additionally, after consultation with counsel, the board concluded that their ignorance of this "tip", at the time they approved the merger with KKR, was insufficient grounds for repudiating the lockup agreement.

After a hearing on Maxwell's motion for a preliminary injunction, on October 17, the Court of Chancery denied Maxwell's request to enjoin the lockup agreement, the break-up fees and expenses granted by the Macmillan board to KKR. In ruling for Macmillan, the trial court found that although KKR was consistently and deliberately favored throughout the auction process, Maxwell was not prevented from, or otherwise misled to refrain from, submitting a higher bid for the company. However, the court found that Macmillan's shareholders should have the opportunity to consider an alternative offer for the company, and therefore enjoined the operation of Macmillan's "poison pill" shareholder rights plan as a defensive measure to Maxwell's still open tender offer. In this appeal neither party has challenged that limited injunction. Thus, the sole issue before us is the validity, under all of the foregoing circumstances, of the asset lockup option granted pursuant to the KKR–Macmillan merger agreement with its attendant breakup fees and expenses.

## II.

As the decision below was based solely upon a documentary record, if the findings of the trial court are clearly in error and justice so requires, this Court must review the entire record and reach its own conclusions with respect to the facts. *Fiduciary Trust Co. v. Fiduciary Trust Co.*, Del.Supr., 445 A.2d 927, 930 (1982); *Ivanhoe Partners v. Newmont Mining Corp.*, Del.Supr., 535 A.2d 1334, 1341 (1987). However, even though we might have independently reached different conclusions, we will accept the findings of the trial judge if they are supported by the record, and otherwise are the product of an orderly and logical deductive reasoning process. *Levitt v. Bouvier*, Del.Supr., 287 A.2d 671, 673 (1972).

When seeking a preliminary injunction, a plaintiff must demonstrate a reasonable probability of success on the merits and that some irreparable harm will occur in the absence of the injunction. *Gimbel v. Signal Companies*, Del.Supr., 316 A.2d 599, 603 (1974). Furthermore, in evaluating the need for a preliminary in-

junction, the Court must balance the plaintiff's need for protection against any harm that can reasonably be expected to befall the defendants if the injunction is granted. When the former outweighs the latter, then the injunction should issue. *Id.*; *Revlon, Inc. v. MacAndrews & Forbes Holdings, Inc.*, Del.Supr., 506 A.2d 173, 179 (1986).

## A.

■ In denying relief to the plaintiffs, it is unclear what legal standards the trial court applied in reviewing defendants' conduct, and thus in evaluating the likelihood of Maxwell's success on the merits. Obviously, application of the correct analytical framework is essential to a proper review of challenges to the decision-making processes of a corporate board. As the Court of Chancery has recognized: "[b]ecause the effect of the proper invocation of the business judgment rule is so powerful and the standard of entire fairness so exacting, the determination of the appropriate standard of judicial review frequently is determinative of the outcome of derivative litigation." *AC Acquisitions v. Anderson, Clayton & Co.*, Del.Ch., 519 A.2d 103, 111 (1986).

While it is apparent that the Court of Chancery seemingly attempted to evaluate this case under the relatively broad parameters of the business judgment rule, it nevertheless held that the relevant inquiry must focus upon the "fairness" of the auction process in light of promoting the maximum shareholder value as mandated by this Court in *Revlon*. In denying Maxwell's motion for an injunction, the Vice–Chancellor concluded that the auction-related deficiencies could be deemed "material" only upon a showing that they actually deterred a higher bid from Maxwell.

We have held that when a court reviews a board action, challenged as a breach of duty, it should decline to evaluate the wisdom and merits of a business decision unless sufficient facts are alleged with particularity, or the record otherwise demonstrates, that the decision was not the product of an informed, disinterested, and independent board. *See Aronson v. Lewis*, Del.Supr., 473 A.2d 805, 812 (1984); *Pogostin v. Rice*, Del.Supr., 480 A.2d 619, 624 (1984); *Smith v. Van Gorkom*, Del.Supr., 488 A.2d 858, 872 (1985). Yet, this judicial reluctance to assess the merits of a business decision ends in the face of illicit manipulation of a board's deliberative processes by self-interested corporate fiduciaries. Here, not only was there such deception, but the board's own lack of oversight in structuring and directing the auction afforded management the opportunity to indulge in the misconduct which occurred. In such a context, the challenged transaction must withstand rigorous judicial scrutiny under the exacting standards of entire fairness. *Weinberger v. UOP, Inc.*, Del. Supr., 457 A.2d 701, 710 (1983); *Gottlieb v. Heyden Chemical Corp.*, Del.Supr., 33 Del.Ch. 177, 91 A.2d 57, 58 (1952). *Compare Rosenblatt v. Getty Oil Co.*, Del. Supr., 493 A.2d 929, 937–40 (1985). What occurred here cannot survive that analysis.[27]

The Vice Chancellor correctly found that Evans and Reilly, as participants in the leveraged buyout, had significant self-interest in ensuring the success of a KKR bid. Given this finding, Evans' and Reilly's deliberate concealment of material information from the Macmillan board must necessarily have been motivated by an interest adverse to Macmillan's shareholders. Evans' and Reilly's conduct throughout was resolutely intended to deliver the company to themselves in *Macmillan I*, and to their

**27.** *See AC Acquisitions v. Anderson, Clayton & Co.*, Del.Ch., 519 A.2d 103, 111 (1986) wherein the court correctly noted that "where a self-interested corporate fiduciary has set the terms of a transaction and caused its effectuation, it will be required to establish the entire fairness of the transaction to a reviewing court's satisfaction."

*Id.* [*citing Weinberger v. UOP, Inc.*, Del.Supr., 457 A.2d 701 (1983); *Sterling v. Mayflower Hotel Corp.*, Del.Supr., 33 Del.Ch. 293, 93 A.2d 107 (1952); *Guth v. Loft*, Del.Supr., 23 Del.Ch. 255, 5 A.2d 503 (1939) ]. We could conceive no clearer instance of the proper application of this most basic rule of law than the present case.

favored bidder, KKR, and thus themselves, in *Macmillan II*. The board was torpid, if not supine, in its efforts to establish a truly independent auction, free of Evans' interference and access to confidential data. By placing the entire process in the hands of Evans, through his own chosen financial advisors, with little or no board oversight, the board materially contributed to the unprincipled conduct of those upon whom it looked with a blind eye.

### B.

It is basic to our law that the board of directors has the ultimate responsibility for managing the business and affairs of a corporation. 8 *Del.C.* § 141(a). In discharging this function, the directors owe fiduciary duties of care and loyalty to the corporation and its shareholders, *Revlon*, 506 A.2d at 179; *Aronson*, 473 A.2d at 811; *Guth v. Loft, Inc.*, Del.Supr., 23 Del.Ch. 255, 5 A.2d 503, 510 (1939). This unremitting obligation extends equally to board conduct in a sale of corporate control. *Smith v. Van Gorkom*, Del.Supr., 488 A.2d 858, 872–73 (1985).

The fiduciary nature of a corporate office is immutable. As this Court stated long ago:

> Corporate officers and directors are not permitted to use their position of trust and confidence to further their private interests. While technically not trustees, they stand in a fiduciary relation to the corporation and its shareholders.... This rule, inveterate and uncompromising in its rigidity, does not rest upon the narrow ground of injury or damage to the corporation resulting from a betrayal of confidence, but upon a broader foundation of a wise public policy that, for the purpose of removing all temptation, extinguishes all possibility of profit flowing from a breach of the confidence imposed by fiduciary relation.

*Guth v. Loft*, 5 A.2d at 510. Not only do these principles demand that corporate fiduciaries absolutely refrain from any act

which breaches the trust reposed in them, but also to affirmatively protect and defend those interests entrusted to them. Officers and directors must exert all reasonable and lawful efforts to ensure that the corporation is not deprived of any advantage to which it is entitled. *Weinberger*, 457 A.2d at 710 (*citing Guth v. Loft*, 5 A.2d at 510).

Thus, directors are required to demonstrate both their utmost good faith and the most scrupulous inherent fairness of transactions in which they possess a financial, business or other personal interest which does not devolve upon the corporation or all stockholders generally. *Aronson*, 473 A.2d at 812; *Pogostin*, 480 A.2d at 624; *Weinberger*, 457 A.2d at 710. When faced with such divided loyalties, directors have the burden of establishing the entire fairness of the transaction to survive careful scrutiny by the courts.

Under Delaware law this concept of fairness has two aspects: fair dealing and fair price. *Weinberger*, 457 A.2d at 711. "Fair dealing" focuses upon the actual conduct of corporate fiduciaries in effecting a transaction, such as its initiation, structure, and negotiation. This element also embraces the duty of candor owed by corporate fiduciaries to disclose all material information relevant to corporate decisions from which they may derive a personal benefit. *See* 8 *Del.C.* § 144. "Fair price," in the context of an auction for corporate control, mandates that directors commit themselves, inexorably, to obtaining the highest value reasonably available to the shareholders under all the circumstances. *Weinberger*, 457 A.2d at 711.

### III.

The voluminous record in this case discloses conduct that fails all basic standards of fairness. While any one of the identifiable breaches of fiduciary duty, standing alone, should easily foretell the outcome, what occurred here, including the

lack of oversight by the directors, irremediably taints the design and execution of the transaction.

It is clear that on July 14, 1988, the day that the Court of Chancery enjoined the management-induced reorganization, and with Bass' $73 offer outstanding, Macmillan's management met with KKR to discuss a management sponsored buyout. This was done without prior board approval. By early September, Macmillan's financial and legal advisors, originally chosen by Evans, independently constructed and managed the process by which bids for the company were solicited. Although the Macmillan board was fully aware of its ultimate responsibility for ensuring the integrity of the auction, the directors wholly delegated the creation and administration of the auction to an array of Evans' hand-picked investment advisors. It is undisputed that Wasserstein, who was originally retained as an investment advisor to Macmillan's senior management, was a principal, if not the primary, "auctioneer" of the company. While it is unnecessary to hold that Wasserstein lacked independence, or was necessarily "beholden" to management, it appears that Lazard Freres, allegedly the investment advisor to the independent directors, was a far more appropriate candidate to conduct this process on behalf of the board. Yet, both the board and Lazard acceded to Wasserstein's, and through him Evans', primacy.

■ While a board of directors may rely in good faith upon "information, opinions, reports or statements presented" by corporate officers, employees and experts "selected with reasonable care," 8 *Del.C.* § 141(e), it may not avoid its active and direct duty of oversight in a matter as significant as the sale of corporate control. That would seem particularly obvious where insiders are among the bidders. This failure of the Macmillan board significantly contributed to the resulting misman-

agement of the bidding process. When presumably well-intentioned outside directors remove themselves from the design and execution of an auction, then what occurred here, given the human temptations left unchecked, was virtually inevitable.

Clearly, this auction was clandestinely and impermissibly skewed in favor of KKR. The record amply demonstrates that KKR repeatedly received significant material advantages to the exclusion and detriment of Maxwell to stymie, rather than enhance, the bidding process.

As for any "negotiations" between Macmillan and Maxwell, they are noteworthy only for the peremptory and curt attitude of Macmillan, through its self-interested chief executive officer Evans, to reject every overture from Maxwell. In Robert Maxwell's initial letter to Evans of July 21, he proposed an $80 all-cash offer for the company. This represented a substantial increase over any other outstanding offer. Indeed, it equalled the highest per share price, which both Wasserstein, Perella and Lazard had previously ascribed to the value of the company on June 7, when the Evans' sponsored restructuring was before the board. Now, not only was Maxwell ignored, but Evans convinced Wasserstein, Perella and Lazard, contrary to their June 7 opinions, ascribing a maximum value to the company of $80 per share, to declare Maxwell's August 12 bid of $80 inadequate.[28] Not only did Macmillan's financial advisors dismiss all Maxwell offers for negotiations, but they also deliberately misled Maxwell in the final stage of the auction by perpetuating the mistaken belief that Maxwell had the high bid. Additionally, Maxwell was subjected to a series of short bid deadlines in a seeming effort to prevent the submission of a meaningful bid. The defendants have totally failed to justify this calculated campaign of resistance and misinformation, despite the strict duties of

---

**28.** Yet, on May 30 these same advisors had found management's $64.15 restructuring to be fair.

care and loyalty demanded of them. *See Revlon*, 506 A.2d at 181.

The tone and substance of the communications between Macmillan and Maxwell dispel any further doubt that Maxwell was seen as an unwelcome, unfriendly and unwanted bidder. Evans, a self-interested fiduciary, repeatedly stated that *he* had no intention of considering a merger with Maxwell, and that *he* would do everything to prevent Maxwell from acquiring Macmillan. Nonetheless, Robert Maxwell's response was a diplomatic, yet persistent, pursuit of Macmillan, emphasizing his desire to work with existing management and his intent to operate the company as a going concern. With the sole exception of his September 9th letter, declining to exceed a "fully financed" offer above $84, Maxwell never retreated from his stated intent to continue bidding for Macmillan, or his willingness to negotiate any other aspect of his offer.

This continuing hostility toward Maxwell cannot be justified after the Macmillan board actually decided on September 10–11 to abandon any further restructuring attempts, and to sell the entire company. Although Evans had begun negotiations with KKR on July 14, the board's action in September formally initiated the auction process. Further discriminatory treatment of a bidder, without any rational benefit to the shareholders, was unwarranted. The proper objective of Macmillan's fiduciaries was to obtain the highest price reasonably available for the company, provided it was offered by a reputable and responsible bidder.[29] *Revlon*, 506 A.2d at 182, 184. At this point, there was no justification for denying Maxwell the same courtesies and access to information as had been extended to KKR. *Id.* at 184. Without board planning and oversight to insulate the self-interested management from improper access to the bidding process, and to ensure the proper conduct of the auction by truly independent advisors selected by, and answerable only to, the independent directors, the legal complications which a challenged transaction faces under *Revlon* are unnecessarily intensified. *See Weinberger*, 457 A.2d at 709 n. 7. *Compare Rosenblatt*, 493 A.2d at 937–40, where an authentic independent negotiating structure had been established.

## IV.

In examining the actual conduct of this auction, there can be no justification for the telephonic "tip" to KKR of Maxwell's $89 all-cash offer following the first round of bidding held on September 26th. Although the defendants contend that this tip was made "innocently" and under the impression that the auction process had already ended, this assertion is refuted by the record. The recipient of the "tip", KKR, immediately recognized its impropriety.[30] Evans' and Reilly's knowing concealment of the tip at the critical board meeting of September 27th utterly destroys their credibility. Given their duty of disclosure under the circumstances, this silence is an explicit acknowledgment of their culpability. *See Nicolet, Inc. v. Nutt*, Del.Supr., 525 A.2d 146, 149 (1987); *Stephenson v. Capano Development, Inc.*,

---

**29.** In assessing the bid and the bidder's responsibility, a board may consider, among various proper factors, the adequacy and terms of the offer; its fairness and feasibility; the proposed or actual financing for the offer, and the consequences of that financing; questions of illegality; the impact of both the bid and the potential acquisition on other constituencies, provided that it bears some reasonable relationship to general shareholder interests; the risk of nonconsummation; the basic stockholder interests at stake; the bidder's identity, prior background and other business venture experiences; and the bidder's business plans for the corporation and their effects on stockholder interests. *Cf. Ivanhoe*, 535 A.2d at 1341–42; *Unocal*, 493 A.2d at 955–56; *Revlon*, 506 A.2d at 182–83.

**30.** Although the KKR representative initially was unaware of the unauthorized nature of the tip, it is revealing that he abruptly terminated the call when he realized that Evans and Reilly were acting improperly. At the least, it stands in stark contrast to the later efforts of KKR, Evans and other defendants to trivialize this extraordinary act of misconduct.

Del.Supr., 462 A.2d 1069, 1074 (1983); *Gibbons v. Brandt*, 170 F.2d 385, 391 (7th Cir.1948).

■■■■ As the duty of candor is one of the elementary principles of fair dealing, Delaware law imposes this unremitting obligation not only on officers and directors, but also upon those who are privy to material information obtained in the course of representing corporate interests. *See Weinberger*, 457 A.2d at 710; *Marciano v. Nakash*, Del.Supr., 535 A.2d 400, 406–407 (1987); *Brophy v. Cities Service Co*, Del. Supr., 31 Del.Ch. 241, 70 A.2d 5, 7 (1949). At a minimum, this rule dictates that fiduciaries, corporate or otherwise, may not use superior information or knowledge to mislead others in the performance of their own fiduciary obligations. The actions of those who join in such misconduct are equally tainted. *See e.g. Penn Mart Realty v. Becker*, Del.Ch., 298 A.2d 349, 351 (1972).

Defendants maintain that the Evans-Reilly tip was immaterial, because it did not prevent Maxwell from submitting a higher bid in the second and final round of the auction on September 26th. However, this "immaterial" tip revealed both the price and form of Maxwell's first round bid, which constituted the two principal strategic components of their otherwise unconditional offer. With this information, KKR knew every crucial element of Maxwell's initial bid. The unfair tactical advantage this gave KKR, since no aspect of its own bid could be shopped, becomes manifest in light of the situation created by Maxwell's belief that it had submitted the higher offer.[31] Absent an unprompted and unexpected improvement in Maxwell's bid, the tip provided vital information to enable KKR to prevail in the auction.

Similarly, the defendants argue that the subsequent Wasserstein "long script"—in reality another form of tip—was an immaterial and "appropriate response" to questions by KKR, providing no tactical information useful to KKR. As to this claim, the eventual auction results demonstrate that Wasserstein's tip relayed crucial information to KKR: the methods by which KKR should tailor its bid in order to satisfy Macmillan's financial advisors. It is highly significant that both aspects of the advice conveyed by the tip—to "focus on price" and to amend the terms of its lockup agreement—were adopted by KKR. They were the very improvements upon which the board subsequently accepted the KKR bid on Wasserstein's recommendation. Nothing could have been more material under the circumstances. It violated every principle of fair dealing, and of the exacting role demanded of those entrusted with the conduct of an auction for the sale of corporate control. *Weinberger*, 457 A.2d at 710–711; *Revlon*, 506 A.2d at 182, 184.

### V.

Given the materiality of these tips, and the silence of Evans, Reilly and Wasserstein in the face of their rigorous affirmative duty of disclosure at the September 27 board meeting, there can be no dispute but that such silence was misleading and deceptive. In short, it was a fraud upon the board. *See generally Nicolet v. Nutt*, 525 A.2d at 149; *Stephenson v. Capano*, 462 A.2d at 1074.

Under 8 *Del.C.* § 141(e), when corporate directors rely in good faith upon opinions or reports of officers and other experts "selected with reasonable care", they nec-

---

**31.** Although KKR maintains that it considered this disclosure of Maxwell's initial bid to be "immaterial", counsel for KKR at oral argument asserted that KKR would have held an analogous disclosure of any aspect of its bid to Maxwell to be material. *See* 1 Mergers & Acquisitions L.Rep. at 902–05. In short, if the same "immaterial" disclosure had been made of KKR's bid, it would have "walked". *Id.* at 905. An example of KKR's incongruous position is demonstrated by the following colloquy:

\* \* \* \* \* \*

JUSTICE HOLLAND: Well, Maxwell's question, realizing they had a cash bid, was, "Do you have a higher bid?" Now, would it have violated your client's no-shop provision to say, "Yes, we do"?

MR. KOOB (counsel for KKR): Your Honor, my client's position is that had that been told to Mr. Maxwell and we found out about it, we would have withdrawn publicly.

*Id.* at 907.

essarily do so on the presumption that the information provided is both accurate and complete. Normally, decisions of a board based upon such data will not be disturbed when made in the proper exercise of business judgment. However, when a board is deceived by those who will gain from such misconduct, the protections girding the decision itself vanish. Decisions made on such a basis are voidable at the behest of innocent parties to whom a fiduciary duty was owed and breached, and whose interests were thereby materially and adversely affected.[32] This rule is based on the unyielding principle that corporate fiduciaries shall abjure every temptation for personal profit at the expense of those they serve.[33] *Guth,* 5 A.2d at 510.

## VI.

In *Revlon,* we addressed for the first time the parameters of a board of directors' fiduciary duties in a sale of corporate control. There, we affirmed the Court of Chancery's decision to enjoin the lockup and no-shop provisions accepted by the Revlon directors, holding that the board had breached its fiduciary duties of care and loyalty.[34]

▉▉▉▉ Although we have held that such agreements are not *per se* illegal, we

recognized that like measures often foreclose further bidding to the detriment of shareholders, and end active auctions prematurely. *Revlon,* 506 A.2d at 183–84; *see also Thompson v. Enstar Corp.,* Del.Ch., 509 A.2d 578 (1984). If the grant of an auction-ending provision is appropriate, it must confer a substantial benefit upon the stockholders in order to withstand exacting scrutiny by the courts. *Cf. Revlon,* 506 A.2d at 183–85; *see also Hanson Trust PLC v. ML SCM Acquisition Inc.,* 781 F.2d 264, 274 (2nd Cir.1986). Moreover, where the decision of the directors, granting the lockup option, was not informed or was induced by breaches of fiduciary duties, such as those here, they cannot survive. *See Revlon,* 506 A.2d at 184; *Hanson Trust,* 781 F.2d at 278–81; *Guth,* 5 A.2d at 503.

### A.

Perhaps the most significant aspect of *Revlon* was our holding that when the Revlon board authorized its management to negotiate a sale of the company:

[t]he duty of the board had thus changed from the preservation of Revlon as a corporate entity to the maximization of the company's value at a sale for the stockholders benefit.... [The board] no longer faced threats to corporate policy

---

**32.** In this context we speak only of the traditional concept of protecting the decision itself, sometimes referred to as the business judgment doctrine. *Revlon,* 506 A.2d at 180 n. 10. The question of the independent directors' personal liability for these challenged decisions, reached under circumstances born of the board's lack of oversight, is not the issue here. However, we entertain no doubt that this board's virtual abandonment of its oversight functions in the face of Evans' and Reilly's patent self-interest was a breach of its fundamental duties of loyalty and care in the conduct of this auction. More than anything else it created the atmosphere in which Evans, Reilly and others could act so freely and improperly. Given these facts, a board can take little comfort in what was said under far different circumstances in *Graham v. Allis–Chalmers Mfg. Co.,* Del.Supr., 41 Del.Ch. 78, 188 A.2d 125, 130–31 (1963). *See Smith,* 488 A.2d at 872; *Lutz v. Boas,* 39 Del.Ch. 585, 171 A.2d 381 (1961). Nor can decisions reached under such circumstances be sustained.

**33.** Although Wasserstein was not a Macmillan officer or director, it is bedrock law that the conduct of one who knowingly joins with a fiduciary, including corporate officials, in breaching a fiduciary obligation, is equally culpable. Thus, decisions based on the advice of such persons share the same defects as those discussed in n. 32, *supra. Ivanhoe,* 535 A.2d at 1344; *Penn Mart Realty,* 298 A.2d at 351.

**34.** Following *Revlon,* there appeared to be a degree of "scholarly" debate about the particular fiduciary duty that had been breached in that case, i.e. the duty of care or the duty of loyalty. In *Ivanhoe,* 535 A.2d at 1345, we made it abundantly clear that *both* duties were involved in *Revlon,* and that both had been breached.

and effectiveness, or to the stockholders' interests, from a grossly inadequate bid. The whole question of defensive measures became moot. The directors' role changed from defenders of the corporate bastion to auctioneers charged with getting the best price for the stockholders at a sale of the company.

*Revlon,* 506 A.2d at 182.

This case does not require a judicial determination of *when* Macmillan was "for sale."[35] By any standards this company was for sale both in *Macmillan I* and *II.* In any event, the board of directors formally concluded on September 11 that it would be in the best interests of the stockholders to sell the company.[36] Evidently, they reached this decision with the prospect of a KKR—management sponsored buyout in mind. Although Evans apparently made the decision to pursue a KKR buyout on July 14, the day the Court of Chancery enjoined his "restructuring", there is no evidence in the record that Evans had acted with board authority on that date.

What we are required to determine here is the scope of the board's responsibility in an active bidding contest once their role as auctioneer has been invoked under *Revlon.* Particularly, we are concerned with the use of lockup and no-shop clauses.

At a minimum, *Revlon* requires that there be the most scrupulous adherence to ordinary principles of fairness in the sense that stockholder interests are enhanced, rather than diminished, in the conduct of an auction for the sale of corporate control. This is so whether the "sale" takes the form of an active auction, a management buyout, or a "restructuring" such as that which the Court of Chancery enjoined in *Macmillan I. Revlon,* 506 A.2d at 181–82. Under these special circumstances the duties of the board are "significantly altered". *Id.* at 182. The defensive aspects of *Unocal* no longer apply. *Id.* The sole responsibility of the directors in such a sale is for the shareholders' benefit. The board may not allow any impermissible influence, inconsistent with the best interests of the shareholders, to alter the strict fulfillment of these duties. *Id.* Clearly, this requires the intense scrutiny and participation of the independent directors, whose conduct comports with the standards of independence enunciated by us in *Aronson v. Lewis,* 473 A.2d at 816.

The Macmillan directors argue that a "blind auction" is a desirable means to fulfill their primary duty to the shareholders. That may be so, but it did not happen here. Only Maxwell was blind.

### B.

Turning to the lockup option, in *Revlon* we held that such an agreement is not *per*

---

35. This Court has been required to determine on other occasions since our decision in *Revlon,* whether a company is "for sale". *See Ivanhoe,* 535 A.2d at 1345; *Bershad v. Curtiss-Wright Corp.,* Del.Supr., 535 A.2d 840, 845 (1987). Clearly not every offer or transaction affecting the corporate structure invokes the *Revlon* duties. A refusal to entertain offers may comport with a valid exercise of business judgment. *See Bershad; Ivanhoe,* 535 A.2d at 1341–42; *Pogostin,* 480 A.2d at 627; *Aronson,* 473 A.2d at 812–16. Circumstances may dictate that an offer be rebuffed, given the nature and timing of the offer; its legality, feasibility and effect on the corporation and the stockholders; the alternatives available and their effect on the various constituencies, particularly the stockholders; the company's long term strategic plans; and any special factors bearing on stockholder and public interests. *Unocal,* 493 A.2d at 954–56. *See also Smith,* 488 A.2d 872–78. In *Ivanhoe* we recognized that a change in corporate structure under the special facts and circumstances of

that case did not invoke *Revlon.* 535 A.2d at 1345. Specifically, Newmont's management faced two potentially coercive offers. In responding to such threats management's efforts were viewed as reasonable decisions intended to guide the corporation through the minefield of dangers directly posed by one bidder, and potentially by another. *Id.* at 1342–45. While it was argued that the transaction benefited management by strengthening its position, at most this was a secondary effect. There was no proof of self-dealing, and the evidence clearly sustained the conclusion that the board of Newmont punctiliously met its fiduciary obligations to the stockholders in the face of two major threats.

36. Macmillan informed this Court in a letter dated September 12, 1988, that the company was going to be sold. The letter was in connection with the pendency of an interlocutory appeal from the Court of Chancery's decision in *Macmillan I.*

se unlawful under Delaware law. *Revlon,* 506 A.2d at 183. We recognized its proper function in a contest for corporate control. Apparently, it has escaped some that in *Revlon* we distinguished the potentially valid uses of a lockup from those that are impermissible:

> "[W]hile those lock-ups which draw bidders into a battle benefit shareholders, similar measures which end an active auction and foreclose further bidding operate to the shareholders detriment."

*Id.* at 183. *See also Hanson Trust,* 781 F.2d at 272.

In this case, a lockup agreement was not necessary to draw any of the bidders into the contest. Macmillan cannot seriously contend that they received a final bid from KKR that materially enhanced general stockholder interests. By all rational indications it was intended to have a directly opposite effect. As the record clearly shows, on numerous occasions Maxwell requested opportunities to further negotiate the price and structure of his proposal. When he learned of KKR's higher offer, he increased his bid to $90.25 per share. *Compare Revlon,* 506 A.2d at 179, 184; *Hanson Trust,* 781 F.2d at 272. Further, KKR's "enhanced" bid, being nominal at best, was a *de minimis* justification for the lockup. When one compares what KKR received for the lockup, in contrast to its inconsiderable offer, the invalidity of the agreement becomes patent. *Cf. Revlon,* 506 A.2d at 184.

■ Here, the assets covered by the lockup agreement were some of Macmillan's most valued properties, its "crown jewels." [37] Even if the lockup is permissible, when it involves "crown jewel" assets careful board scrutiny attends the decision. When the intended effect is to end an active auction, at the very least the independent members of the board must attempt to negotiate alternative bids before granting such a significant concession. *See Revlon,* 506 A.2d at 183; *Hanson Trust,* 781 F.2d at 277. Maxwell invited negotiations for a purchase of the same four divisions, which KKR originally sought to buy for $775 million. Maxwell was prepared to pay $900 million. Instead of serious negotiations with Maxwell, there were only concessions to KKR by giving it a lockup of seven divisions for $865 million.

Thus, when directors in a *Revlon* bidding contest grant a crown jewel lockup, serious questions are raised, particularly where, as here, there is little or no improvement in the final bid. *Revlon,* 506 A.2d at 184, 187. The care and attention which independent directors bring to this decision are crucial to its success. *Cf. Weinberger,* 457 A.2d at 709 n. 7; *Rosenblatt,* 493 A.2d at 937–38.

## C.

■ As for the no-shop clause, *Revlon* teaches that the use of such a device is even more limited than a lockup agreement. Absent a material advantage to the stockholders from the terms or structure of a bid that is contingent on a no-shop clause, a successful bidder imposing such a condition must be prepared to survive the careful scrutiny which that concession demands. *Revlon,* 506 A.2d at 184.

## VII.

## A.

■ Directors are not required by Delaware law to conduct an auction according to some standard formula, only that they observe the significant requirement of fairness for the purpose of enhancing general shareholder interests. That does not preclude differing treatment of bidders when necessary to advance those interests. Variables may occur which necessitate

---

**37.** In the current takeover parlance, these are valuable assets or lines of business owned by a target company. The attempt is to sell them to third parties or place them under option at bargain prices as a device to defeat an unwanted takeover attempt. Hamilton, *supra,* at 549; Solomon, Schwartz & Bauman, *supra,* at 328.

such treatment.[38] However, the board's primary objective, and essential purpose, must remain the enhancement of the bidding process for the benefit of the stockholders.

We recognize that the conduct of a corporate auction is a complex undertaking both in its design and execution. *See e.g.* McAfee & Macmillan, *Auctions and Bidding,* 25 J.Econ.Lit. 699 (1987); Milgrom, *The Economics of Competitive Bidding: A Selected Survey,* in Social Goals and Social Organization 261 (Hurwitz, Schneidler & Sonnenschein eds. 1985.) We do not intend to limit the broad negotiating authority of the directors to achieve the best price available to the stockholders. To properly secure that end may require the board to invoke a panoply of devices, and the giving or receiving of concessions that may benefit one bidder over another. *See e.g., In re J.P. Stevens & Co., Inc. Shareholders Litigation,* Del.Ch., 542 A.2d 770, 781–784 (1988); *appeal refused,* 540 A.2d 1088 (1988). But when that happens, there must be a rational basis for the action such that the interests of the stockholders are manifestly the board's paramount objective.

## B.

In the absence of self-interest, and upon meeting the enhanced duty mandated by *Unocal,* the actions of an independent board of directors in designing and conducting a corporate auction are protected by the business judgment rule. *Ivanhoe,* 535 A.2d at 1341; *Unocal,* 493 A.2d at 954; *Pogostin,* 480 A.2d at 627. Thus, like any other business decision, the board has a duty in the design and conduct of an auction to act in "the best interests of the corporation and its shareholders." *Unocal,* 493 A.2d at 954–56; *Ivanhoe,* 535 A.2d at 1341–42.

However, as we recognized in *Unocal,* where issues of corporate control are at stake, there exists "the omnipresent specter that a board may be acting primarily in its own interests, rather than those of the corporation and its shareholders." *Unocal,* 493 A.2d at 954. For that reason, an "enhanced duty" must be met at the threshold before the board receives the normal protections of the business judgment rule. *Id.* Directors may not act out of a sole or primary desire to "perpetuate themselves in office." *Id.* at 955; *Cf. Cheff v. Mathes,* Del.Supr., 41 Del.Ch. 494, 199 A.2d 548, 556 (1964); *Kors v. Carey,* 39 Del.Ch. 47, 158 A.2d 136, 140 (1960).

As we held in *Revlon,* when management of a target company determines that the company is for sale, the board's *responsibilities* under the enhanced *Unocal* standards are significantly altered. *Revlon.* 506 A.2d at 182. Although the board's *responsibilities* under *Unocal* are far different, the enhanced *duties* of the directors in responding to a potential shift in control, recognized in *Unocal,* remain unchanged. This principle pervades *Revlon,*[39] and when directors conclude that an auction is appropriate, the standard by which their ensuing actions will be judged continues to be the enhanced duty imposed by this Court in *Unocal.*

It is not altogether clear that, since our decision in *Revlon,* the Court of Chancery has *explicitly* applied the enhanced *Unocal* standards in reviewing such board actions. *See generally, In re R.J.R. Nabisco Inc. Shareholders Litigation,* Del.Ch., C.A. No. 10389, 1989 WL 7036 (Consolidated) (Janu-

---

**38.** For example, this Court has upheld actions of directors when a board is confronted with a coercive "two-tiered" bust-up tender offer. *See Unocal,* 493 A.2d at 956; *Ivanhoe,* 535 A.2d at 1342. *Compare Revlon,* 506 A.2d at 184.

**39.** *See e.g. Revlon,* 506 A.2d at 184 ("Thus, when a board ends an intense bidding contest on an insubstantial basis, and where a significant by-product of that action is to protect the directors

against a perceived threat of personal liability ... the action cannot withstand the enhanced scrutiny which *Unocal* requires of director conduct."). Further, "when bidders make relatively similar offers, or dissolution of the company becomes inevitable, the directors cannot fulfill their enhanced *Unocal* duties by playing favorites with the contending factions." *Id.*

ary 31, 1989); *In re Holly Farms Corporation Shareholders Litigation*, Del.Ch., C.A. No. 10340, 1988 WL 143010 (Consolidated) (December 30, 1988); *In re Fort Howard Corporation Shareholders Litigation*, Del.Ch., C.A. No. 9991, 1988 WL 83147 (Consolidated) (August 8, 1988); *In re J.P. Stevens & Co., Inc., Shareholders Litigation*, Del.Ch. 542 A.2d 770 (1988). On the surface, it may appear that the trial court has been applying an ordinary business judgment rule analysis. However, on closer scrutiny, it seems that there has been a *de facto* application of the *enhanced* business judgment rule under *Unocal.* To the extent that this has caused confusion, we think it is more a matter of semantics than of substance.[40]

When *Revlon* duties devolve upon directors, this Court will continue to exact an enhanced judicial scrutiny at the threshold, as in *Unocal*, before the normal presumptions of the business judgment rule will apply. However, as we recognized in *Revlon*, the two part threshold test, of necessity, is slightly different. *Revlon*, 506 A.2d at 182.

At the outset, the plaintiff must show, and the trial court must find, that the directors of the target company treated one or more of the respective bidders on unequal terms. It is only then that the two-part threshold requirement of *Unocal* is truly invoked, for in *Revlon* we held that "[f]avoritism for a white knight to the total exclusion of a hostile bidder might be justifiable when the latter's offer adversely affects shareholder interests, but ... the directors cannot fulfill their enhanced *Unocal* duties by playing favorites with the contending factions." *Id.* 506 A.2d at 184.

In the face of disparate treatment, the trial court must first examine whether the directors properly perceived that shareholder interests were enhanced. In any event the board's action must be reasonable in relation to the advantage sought to be achieved, or conversely, to the threat which a particular bid allegedly poses to stockholder interests. *Unocal*, 493 A.2d at 955.

If on the basis of this enhanced *Unocal* scrutiny the trial court is satisfied that the test has been met, then the directors' actions necessarily are entitled to the protections of the business judgment rule. The latitude a board will have in responding to differing bids will vary according to the degree of benefit or detriment to the shareholders' general interests that the amount or terms of the bids pose. We stated in *Revlon*, and again here, that in a sale of corporate control the responsibility of the directors is to get the highest value reasonably attainable for the shareholders. *Revlon*, 506 A.2d at 182. Beyond that, there are no special and distinct "Revlon duties". Once a finding has been made by a court that the directors have fulfilled their fundamental duties of care and loyalty under the foregoing standards, there is no further judicial inquiry into the matter. *See In re R.J.R. Nabisco, supra* at 53–56. *See also In re J.P. Stevens & Co., supra; In re Fort Howard, supra; compare In re Holly Farms, supra.*

For the foregoing reasons, the judgment of the Court of Chancery, denying Maxwell's motion for a preliminary injunction, is REVERSED.

---

**40.** A good example illustrating our conclusion is found in *Fort Howard.* There, the following statement of the trial court is instructive:

> I note that one's view concerning *bona fides*, will, in settings such as this, almost always rest upon inferences that can be drawn from decisions made or courses of actions pursued by the board (or a Special Committee). Rarely will direct evidence of bad faith—admissions or evidence of conspiracy—be available. Moreover, due regard for the protective nature of the stockholders' class action, requires the court, in these cases, to be suspicious, to exercise such powers as it may possess to look imaginatively beneath the surface of events, which, in most instances, will itself be well-crafted and unobjectionable. Here there are aspects that supply a suspicious mind with fuel to feed its flame. Slip op. at 30.