# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| IN RE TOWERS WATSON & CO. | ) | Consolidated |
| STOCKHOLDERS LITIGATION | ) | C.A. No. 2018-0132-KSJM |

## MEMORANDUM OPINION

Date Submitted: April 11, 2019
Date Decided: July 25, 2019

Michael J. Barry, Christine M. Mackintosh, GRANT & EISENHOFER P.A., Wilmington, Delaware; *Counsel for Plaintiff Alaska Laborers-Employers Retirement Trust*.

Michael J. Barry, Christine M. Mackintosh, GRANT & EISENHOFER P.A., Wilmington, Delaware; Lee D. Rudy, Geoffrey C. Jarvis, J. Daniel Albert, Stacey A. Greenspan, KESSLER TOPAZ MELTZER & CHECK, LLP, Radnor, Pennsylvania; *Counsel for Plaintiff City of Fort Myers General Employees' Pension Fund.*

Bradley R. Aronstam, Roger S. Stronach, ROSS ARONSTAM & MORITZ LLP, Wilmington, Delaware; John A. Neuwirth, Joshua S. Amsel, Matthew S. Connors, Amanda K. Pooler, Sean Moloney, WEIL, GOTSHAL & MANGES LLP, New York, New York; *Counsel for Defendants Victor F. Ganzi, John J. Haley, Leslie S. Heisz, Brenda R. O'Neill, Linda D. Rabbitt, Gilbert T. Ray, Paul Thomas, and Wilhelm Zeller*.

Raymond J. DiCamillo, Sarah T. Andrade, RICHARDS, LAYTON & FINGER, P.A., Wilmington, Delaware; Richard S. Horvath, Jr., PAUL HASTINGS LLP, San Francisco, California; *Counsel for Defendants ValueAct Capital Management, L.P. and Jeffrey Ubben.*

**McCORMICK, V.C.**

This stockholder class action challenges the $18 billion merger-of-equals between Towers Watson & Co. ("Towers") and Willis Group Holdings plc ("Willis"). After the transaction was publicly announced, multiple stockholders and analysts disparaged the deal as a windfall for Willis. Unsure of whether the Towers stockholders would approve the transaction, the Towers board postponed the stockholder vote. Towers's CEO, who was also Towers's lead negotiator, then renegotiated the transaction, securing a dividend for Towers's stockholders more than double the amount previously agreed upon by the merging parties.

The defendants have moved to dismiss this action. In briefing, the defendants focused on arguing under the recently fashionable *Corwin* doctrine that a fully informed stockholder vote restored the business judgment rule.[1] But this decision need not reach *Corwin*, as long-settled corporate law principles warrant business judgment deference. Namely, the plaintiffs do not argue that the merger, a mostly stock-for-stock transaction between widely held, publicly traded entities, is subject to enhanced scrutiny under *Revlon*.[2] Nor do they challenge any deal protection devices to trigger enhanced scrutiny under *Unocal*.[3] The transaction thus is

---

[1] *Corwin v. KKR Fin. Hldgs. LLC*, 125 A.3d 304 (Del. 2015).

[2] *Revlon, Inc. v. MacAndrews & Forbes Hldgs., Inc.*, 506 A.2d 173 (Del. 1986).

[3] *Unocal Corp. v. Mesa Petroleum Co.*, 493 A.2d 946 (Del. 1985).

presumptively subject to the business judgment rule, and the plaintiffs must plead facts sufficient to rebut or overcome this presumption in order to state a claim.

In an effort to rebut the presumption of the business judgment rule, the plaintiffs rely on *Cinerama, Inc. v. Technicolor, Inc.*, arguing that Towers's CEO and lead negotiator suffered a material conflict, which he failed to disclose to the Towers board, and which a reasonable board member would have regarded as significant in evaluating the proposed transaction.[4] The plaintiffs specifically point to a compensation proposal made to the CEO by a holder of 10% of Willis's stock after the initial deal was struck but before the CEO secured a higher dividend. Under the allegedly undisclosed proposal, the CEO would receive materially greater upside in his compensation post-merger than he had received pre-merger. The plaintiffs say that this proposal misaligned the CEO's incentives at a critical juncture in the negotiations, inspiring him to ask for no more of a dividend than he believed necessary to secure Towers's stockholder approval.

The fact of the allegedly undisclosed compensation proposal fails to rebut the business judgment rule. At bottom, the Towers board knew that the CEO would become CEO of the combined company post-merger, that the combined company would be much larger, and that the CEO thus would be entitled to increased compensation. Knowing this potential conflict, the board nevertheless appointed the

---

[4] 663 A.2d 1156, 1168 (Del. 1995).

CEO as lead negotiator but kept apprised of the negotiations. Further, the compensation proposal was a proposal only; it reflected a theory of compensation and upside potential in the event of pie-in-the-sky outcomes unconnected to any business plan or forecast. Given what the board already knew, and the nature of the compensation proposal at issue, a reasonable board member would not have regarded the proposal as significant when evaluating the proposed transaction. The business judgment rule therefore applies, and this decision grants the defendants' motion to dismiss.

## I.    FACTUAL BACKGROUND

The facts are drawn from the Verified First Amended Class Action Complaint (the "Amended Complaint")[5] and documents it incorporates by reference.

### A.    The Original Merger Agreement

Willis, an Ireland corporation, was a publicly traded global advisory, brokering, and solutions company. Willis's second largest stockholder, ValueAct Capital Management, L.P. ("ValueAct"), held over 10% of Willis's shares. ValueAct's founder and CEO, Jeffrey Ubben, sat on the Willis board of directors. In late 2014, at Ubben's recommendation, Willis began a review of strategic alternatives that could provide enhanced scale for the company. One such alternative included a merger with Towers, a publicly traded professional services

---

[5] C.A. No. 2018-0132-KSJM Docket ("Dkt.") 66, Am. Compl.

firm incorporated under Delaware law, with a focus on helping organizations improve performance through risk management, human resources, and actuarial and investment consulting.

In early 2015, the CEOs for Willis and Towers, Dominic Casserley and John K. Haley respectively, met to discuss a business combination. After meetings in January and February, the pair agreed to explore a transaction and entered into a non-disclosure agreement on March 29, 2015.[6] Each company retained financial advisors. For Towers, Haley engaged Merrill Lynch, Pierce, Fenner & Smith Inc. ("Merrill Lynch").

For a period of only eleven days in May 2015, the Towers board authorized a special committee to negotiate the Willis transaction.[7] On the tenth day, the special committee met with Haley, who gave the special committee a detailed summary of his conversations with Willis, addressing the strategic rationale for and potential synergies from the transaction. The committee directed Haley to present this information to the full Towers board at a board meeting scheduled for the following

---

[6] While the deal between Towers and Willis was developing, Haley sold 106,933 shares of Towers stock, or 55% of his stake, for approximately $10 million. The Amended Complaint alleges that if Haley thought a merger would increase the value of his Towers shares he would not have sold his stock. Although alleged, this fact was not featured in any of the plaintiffs' arguments.

[7] The Towers board comprised directors Haley, Victor F. Ganzi, Leslie S. Heisz, Brendan R. O'Neill, Linda D. Rabbitt, Gilbert T. Ray, Paul Thomas, and Wilhelm Zeller (together the "director defendants"). The special committee comprised directors Ganzi, O'Neill, Rabbitt, and Thomas.

day.  At that meeting, the directors excused Haley from much of the merger-related discussions and disbanded the special committee.  The committee neither evaluated the merger nor helped negotiate it.

Haley spearheaded negotiations for Towers.  The transaction presented a potential "merger of equals," meaning that neither company was "acquiring" the other.  The nature of the transaction required negotiating several issues beyond price, including who would lead the combined company, how to structure the transaction, and whether one company was entitled to a premium over its public trading price.

Leadership of the combined company was decided first.  Before the special committee was disbanded, the committee discussed the combined companies' leadership, and independent director Rabbitt was tasked with recommending to Willis's Board Chairman James McCann that Haley run the combined entity.  Rabbitt reached out to McCann that same day.  McCann then discussed the proposal with Casserley, and Casserley accepted the proposal on May 19, 2015.

Despite this leadership determination, the Towers board authorized Haley to continue to lead the merger negotiations for Towers.  During the discussions held in early 2015, Haley had kept Rabbitt informed.  After the parties agreed to name Haley

CEO, on two instances, Towers independent director Ganzi joined Haley for negotiations,[8] and Haley continued to update the Towers board on negotiations.[9]

In the May 2015 negotiations, Haley suggested that the structure of the merger should be based on the companies' respective market capitalization. Willis responded that the pro forma ownership of the combined company should be based on the relative contribution of several different financial metrics; this resulted in Willis stockholders owning a larger percentage of the combined company. Haley and Casserley also discussed the potential form of consideration, along with other merger terms including a pre-merger cash dividend for Towers's stockholders, the exchange ratio, post-merger board composition, and the resulting ownership of the combined company by Towers and Willis stockholders, respectively.

By June 1, 2015, Haley and Ganzi proposed the following transaction: Willis would pay a $500 million dividend to Towers's stockholders, Willis's stockholders

---

[8] As outlined below, Ganzi joined Haley in negotiating merger terms on June 1 and June 7, 2015. These negotiations concerned deal consideration, equity ownership, and the stock exchange ratio. Although Willis rejected Towers's initial proposal, Willis accepted Ganzi and Haley's revised deal structure, proposed on June 7.

[9] After the parties agreed in principle to the deal structure that Ganzi and Haley had proposed, Haley met with the Towers board four times. On June 14, 2015, Haley presented a transaction status report to the Towers board during a special telephonic meeting. On June 20, 2015, Haley presented at an in-person board meeting an update on the status of the transaction and the due diligence performed to date. Then, on both June 27 and June 29, 2015, Haley participated in special telephonic board meetings held to review the transaction.

would own approximately 51% of the combined company, and Towers's stockholders would own the remaining 49%.

ValueAct's Ubben was dissatisfied with Towers's proposal and the progress of negotiations. By email, Ubben demanded that Willis press Towers harder and "use ValueAct in this negotiation" by telling Towers that (1) ValueAct would not approve the merger without a reasonable premium; (2) there was no merger without ValueAct's support; and (3) ValueAct must meet Haley.[10] If the negotiators failed to follow these demands, Ubben threatened to break up and sell Willis.[11]

Days later, on June 5, 2015, Willis counteroffered with terms that did not include a dividend. The counteroffer provided that Willis's stockholders would own approximately 50.1% of the combined company while Towers's stockholders would own the remaining 49.9%.

In response, on June 7, 2015, Haley and Ganzi proposed a $337 million dividend (about $4.87/share) to Towers's stockholders and adopted Willis's June 5 proposal on stockholder ownership structure, with Willis's stockholders owning the majority. Casserley agreed in principle to the counteroffer on June 10, 2015. The parties then engaged in diligence.

---

[10] Am. Compl. ¶ 63 (describing June 2, 2015 email from Ubben to Titus Leung, Willis's deal team head at financial advisor Perella Weinberg Partners LP).

[11] ValueAct had shared its break-up analysis for Willis on May 13, 2015, and told Leung that it "represent[ed] something close to the maximum possible value for [Willis] shareholders . . . ." *Id.* ¶ 59.

7

As the parties conducted diligence, the Towers board met multiple times with their advisors and Towers management to discuss the status of the transaction, requesting detailed follow-up on synergies, which management provided at subsequent meetings.

On June 27, 2015, Towers and Willis agreed in principle, subject to their respective boards' approval. The terms mirrored those reached by Haley and Casserley just weeks earlier. That same day, the Towers board convened to review the transaction. The board members discussed the transaction terms, due diligence, potential synergies, and their legal obligations as directors. Over the next few days, Towers's outside counsel fielded additional questions from the Towers board.

As a condition to entering into the merger agreement, Towers required that ValueAct enter into a voting agreement in support of the merger. Willis consulted with ValueAct and Ubben to ensure that ValueAct supported the merger and was willing to enter into the voting agreement. Representatives of ValueAct, including Ubben, discussed the proposed merger internally and with Willis. They also offered to meet with Haley and other Towers representatives.

The Towers board met on June 29, 2015, to review Merrill Lynch's financial analyses. Merrill Lynch rendered an oral fairness opinion and later confirmed its opinion in writing. The Towers board unanimously approved the terms outlined in the merger agreement, which the parties executed later that day.

Under the merger agreement, Towers's stockholders would receive a dividend of $4.87/share and following the closing of the merger, own approximately 49.9% of the combined company. Based on the trading price of Willis shares, Haley's counteroffer valued each share of Towers stock at $125.13, or a 9% discount to the $137.98 closing price of Towers stock on June 28, 2015.

## B. Reactions to the Initial Merger Agreement

Towers and Willis announced the merger on June 30, 2015. Towers's stockholders reacted negatively to the announcement. In the months before the merger, Willis's financial condition had worsened, and Towers's financial condition had strengthened. Regarding the merger, analysts noted that Willis "appears to be extracting more value from the transaction than" Towers.[12] By the close of trading on the day the merger was announced, Towers's stock price had dropped 9%.

Negative reactions continued into September 2015. Willis's financial woes exacerbated the issue. Willis missed earnings in July. In contrast, Towers reported in August earnings that beat street expectations and set a record-breaking fiscal year. Analysts remarked, and the plaintiffs allege, that the market reaction imperiled the deal by decreasing the likelihood that Towers would obtain the majority stockholder approval necessary to close.

---

[12] *Id.* ¶ 76.

## C. The Compensation Proposal

In early September 2015, ValueAct's Ubben presented Haley with a three-page document entitled "Towers [] Compensation Review September 2015."[13] The presentation showed Haley's long-term incentive compensation under three scenarios: (1) Haley's then-current plan at Towers, worth around $24 million; (2) Haley's then-current plan applied at the combined entity, worth around $48 million; and (3) ValueAct's incentive-based compensation proposal reflecting ValueAct's compensation philosophy.

ValueAct's compensation philosophy aimed to tie Haley's compensation to comparable peer performance. Haley would earn below executives of peer companies for below average or average performance, and above executives of peer companies for outperformance, defined to mean an annualized 30% internal rate of return or higher.

Haley did not inform the Towers board of ValueAct's compensation proposal, according to the plaintiffs. But the plaintiffs do not allege that Haley remained silent or engaged in negotiations with ValueAct. The plaintiffs allege that Haley told ValueAct to discuss the proposal with Gene Wickes, Towers's managing director of benefits.

---

[13] *Id.* ¶ 91.

**D. The Proxy**

On October 13, 2015, Towers and Willis jointly filed a proxy soliciting votes in favor of the merger (the "Proxy").[14] About two weeks later, Haley and ValueAct presented to Institutional Shareholder Services ("ISS") regarding the merger. They also worked together to solicit support for the merger from Towers's largest stockholders, including The Vanguard Group and BlackRock, Inc.

One stockholder launched a public campaign against the transaction in mid-September. Driehaus Capital Management ("Driehaus") sent an opposition letter to stockholders (also filed with the SEC) noting that Haley was likely in line for a pay raise commensurate with the increased size of the post-merger entity. Over the next two months, Driehaus filed five additional opposition letters against the merger. One of Driehaus's letters pointedly asked whether Towers "management ha[s] 'skin in the game?' Are incentives aligned?"[15]

Towers publicly responded to Driehaus on November 3, 2015, filing an investor presentation with the SEC that sought to "set the record straight" and that touted Towers's existing compensation practices.[16] It did not refer to ValueAct's compensation proposal.

---

[14] Dkt. 74, Transmittal Aff. of Bradley R. Aronstam in Supp. of TW Defs.' Mot. to Dismiss Pls.' Verified First Am. Class Action Compl. ("Aronstam Aff.") Ex. B. ("Proxy").

[15] Am. Compl. ¶ 114 (alteration in original).

[16] *Id.* ¶ 115.

11

Driehaus emailed his response to Towers six days later, asking about Haley and ValueAct's communications, including whether they had discussed Haley's post-merger compensation. Driehaus explained: "[S]hareholders are concerned that [Haley's] relationship with [ValueAct] has impaired—and, more importantly, continues to impair—Mr. Haley's ability to negotiate in good faith on behalf of Towers . . . shareholders."[17]

Towers replied to Driehaus's email, copying Ubben: "[T]here have been various discussions between [Towers] representatives and members of the Willis board, as well as large shareholders, including ValueAct, all of which were appropriate."[18]

In November 2015, ISS recommended that Towers stockholders reject the merger.

### E. Renegotiated Terms

In light of the negative market reaction, Towers determined to propose new terms to Willis. On November 10, 2015, Haley proposed increasing the special dividend to $10.00 per share. Willis rejected Haley's proposal and instructed Haley

---

[17] *Id.* ¶ 116 (third alteration in original). The only public disclosure concerning ValueAct's involvement in the merger was its execution of the Voting Agreement and Ubben's seat on the Willis Board. *See e.g.*, Proxy at 124, 182.

[18] Am. Compl. ¶ 118 (first alteration in original).

to focus on soliciting Towers stockholders rather than renegotiating the merger consideration.

At a special meeting held on November 17, 2019, the Towers board voted to adjourn the stockholder meeting scheduled for November 18, 2015, and determined to renew the $10.00 per share dividend demand. Haley had consulted with Ubben prior to the meeting. According to handwritten notes of the November 17, 2015 Towers board meeting, Haley recounted his conversation with Ubben to the Towers board, and further told the board that the $10.00 amount "[d]idn't trouble [Ubben]."[19]

After the November 17, 2015 Towers board meeting, Haley renewed the proposal to Willis for a $10.00 per share special dividend. In this meeting, Haley allegedly informed Casserley that the $10.00 per share dividend would be the minimum increase necessary to get the deal done. This time, the Willis board accepted the proposal. By the close of business on November 18, 2015, Haley and Willis had agreed upon the renegotiated terms, and Haley updated the board at another special meeting.

The day after the parties reached the renegotiated terms, on November 19, 2015, the Towers board convened the third special meeting of November. Merrill Lynch rendered an oral opinion, later confirmed in writing, that the renegotiated

---

[19] Am. Compl. ¶ 124.

terms were fair, from a financial point of view, to Towers's stockholders. The Towers board then unanimously voted to approve attendant amendments to the merger agreement, and publicly announced the changes the next day. Towers then filed a supplemental proxy on November 27, 2015.

At the stockholder vote held on December 11, 2015, 62% of the Towers stockholders voted in favor of the merger. The merger closed on January 4, 2016, to form Willis Towers plc ("Willis Towers").

## F.    Haley's Compensation Agreement

Days after the stockholder vote, Willis's compensation committee chair Wendy Lane contacted ValueAct "to catch up on the conversations" between Ubben and Haley over compensation.[20]  ValueAct sent Lane the "analysis" of slides from Ubben's pitch to Haley[21] stating that ValueAct would "tweak[]" the compensation proposal to make it more in depth before sharing it with Haley and the Willis Towers board.[22]

Post-closing, Ubben sat on Willis Towers's board and compensation committee, and Lane chaired the Willis Towers's compensation committee. The

---

[20] Am. Compl. ¶ 135.

[21] *Id.*

[22] *Id.*

14

compensation committee engaged compensation consultant Semler Brossy Consulting Group LLC.

About one month after the merger closed, the Willis Towers compensation committee consultant proposed that Haley be eligible to earn far less long-term compensation than set forth in ValueAct's compensation proposal. Wickes, now in his capacity as head of Willis Towers's Exchange Solutions Division, objected: "[W]e are not OK with this proposal . . . . The value in it is considerably less than the ValueAct structure and proposal we have been working with . . . especially with the significant cut in the number of shares."[23]  Haley also objected: "[W]e don't agree with this proposal . . . . Gene Wickes and Gordon Gould have been working with [ValueAct Partners] . . . to adjust the original ValueAct proposal. These discussions have been fruitful and they arrived at a solution that is satisfactory to all of them."[24]

The compensation committee finalized Haley's compensation plan on March 1, 2016. Haley's employment agreement differed in some ways from the ValueAct compensation proposal. The proposal focused on the amount of equity compensation Haley hypothetically could achieve if the combined entity met certain

---

[23] *Id.* ¶ 140 (emphasis omitted).

[24] *Id.* ¶ 141 (emphasis omitted).

shareholder return milestones.[25]  The ultimate employment agreement included a base salary, cash incentives, and a tiered performance-based equity component.  The potential payout Haley would receive for achieving milestones under the ValueAct presentation differed from Haley's eventual employment agreement; the agreement provided more potential upside than the ValueAct compensation proposal.[26]

## G.    Litigations

The merger inspired multiple waves of lawsuits in addition to this action.  Certain Towers stockholders sued to preliminarily enjoin the merger, but they voluntarily dismissed the action after Towers supplemented its proxy materials.[27]  After the merger closed, another stockholder group filed an appraisal petition in this Court in March 2016.[28]    In that action, certain emails, depositions, and other discovery was made available to the plaintiffs in this action.  The appraisal case settled in September 2017.  Then, another stockholder filed an action in the United States District Court for the Eastern District of Virginia.  The federal action was

---

[25] *Compare* Aronstam Aff. Ex. J ("2016 Proxy Statement") at 34, *with id*. Ex. E ("Towers Compensation Review").

[26] *Compare* Towers Compensation Review at 2 (300% maximum payout for achieving shareholder return milestones), *with* 2016 Proxy Statement at 33–34 (350% maximum payout for achieving shareholder return milestones).

[27] *See In re Towers Watson & Co. S'holders Litig.*, C.A. No. 11270-CB (Del. Ch.).

[28] *In re Appraisal of Towers Watson & Co.*, C.A. No. 12064-CB (Del. Ch.).

16

dismissed with prejudice in July 2018.[29] That dismissal decision is now on appeal. Yet another set of Towers stockholders filed a case in New York state court in October 2018 and voluntarily dismissed that action in April 2019.[30]

This lawsuit arose from three separate stockholder actions filed in early 2018 and consolidated in April 2018. The operative complaint names as defendants the directors on the Towers board when the merger closed, ValueAct, and Ubben (together, "Defendants"). Defendants moved to dismiss the complaint on November 17, 2018. The plaintiffs ("Plaintiffs") amended their complaint in response, and Defendants renewed their motions to dismiss. The parties completed briefing on March 29, 2019,[31] and the Court held oral argument on April 11, 2019.[32]

## II. LEGAL ANALYSIS

The Amended Complaint asserts three causes of action. In Count I, Plaintiffs claim that Haley breached his fiduciary duties by failing to disclose the ValueAct

---

[29] *In re Willis Towers Watson PLC Proxy Litig.*, 2018 WL 3423859, at *7 (E.D. Va. July 11, 2018).

[30] *See* Compl., *Naya Master Fund, LP v. Haley*, Index No. 654968/2018 (N.Y. Sup. Ct. Oct. 5, 2018).

[31] Dkt. 74, Opening Br. of the TW Defs. in Supp. of their Mot. to Dismiss Pls.' Verified First Am. Class Action Compl. ("Dir. Defs.' Opening Br."); Dkt. 75, Defs. ValueAct Capital Mgmt., L.P.'s and Jeffrey Ubben's Opening Br. in Supp. of their Mot. to Dismiss; Dkt. 82, Pls.' Omnibus Answering Br. in Opp'n to Defs.' Mots. to Dismiss ("Pls.' Ans. Br."); Dkt. 83, Reply Br. of the TW Defs. in Further Supp. of their Mot. to Dismiss Pls.' Verified First Am. Class Action Compl. ("Dir. Defs.' Reply Br."); Dkt. 84, Defs. ValueAct Capital Mgmt. L.P.'s and Jeffrey Ubben's Reply Br. in Supp. of Their Mot. to Dismiss.

[32] Dkt. 88, Tr. of Oral Arg. on Defs.' Mots. to Dismiss ("Oral Arg. Tr.").

17

proposal to the Towers board. In Count II, Plaintiffs claim that the director defendants breached their fiduciary duties by allowing Haley to negotiate the transaction. In Count III, Plaintiffs claim that ValueAct and Ubben aided and abetted in the director defendants' breach of their fiduciary duties.

Defendants move to dismiss the Amended Complaint pursuant to Court of Chancery Rule 12(b)(6).[33] They argue that the business judgment standard presumptively applies given the nature of the merger and Plaintiffs' failure to plead facts sufficient to rebut the business judgment rule. Alternatively, they argue under *Corwin* that a fully informed stockholder vote invoked the business judgment standard. Because the first issue is dispositive, this decision does not address the second issue.[34]

The Court will grant a motion to dismiss under Rule 12(b)(6) only if the "plaintiff could not recover under any reasonably conceivable set of circumstances susceptible of proof."[35] When considering such a motion, the Court must "accept all well-pleaded factual allegations in the Complaint as true . . . [and] draw all reasonable inferences in favor of the plaintiff[.]"[36] The Court need not "accept every

---

[33] Ct. Ch. R. 12(b)(6).

[34] *See generally In re MeadWestvaco S'holder Litig.*, 168 A.3d 675, 684 (Del. Ch. 2017).

[35] *Cent. Mortg. Co. v. Morgan Stanley Mortg. Capital Hldgs. LLC*, 27 A.3d 531, 536 (Del. 2011) (citing *Savor, Inc. v. FMR Corp.*, 812 A.2d 894, 896–97 (Del. 2002)).

[36] *Id.*

strained interpretation of the allegations,"[37] or "credit conclusory allegations that are not supported by specific facts[.]"[38]

## A. Breach of Fiduciary Duties

Defendants argue that the business judgment rule presumptively applies to the challenged transaction because the transaction is a mostly stock-for-stock merger between widely-traded public entities and because the propriety of deal protection devices are not at issue.[39] Plaintiffs do not dispute that the business judgment rule presumptively applies.[40] Instead, they try to rebut the business judgment rule and invoke the entire fairness standard based solely on Haley's alleged conflict of interests.

### 1. The business judgment rule applies.

To rebut the business judgment rule based solely on the material conflicts of a minority of the directors of a multi-director board, a plaintiff must allege that those conflicts affected the majority of the board.[41] A plaintiff can show this in one of two

---

[37] *Malpiede v. Townson*, 780 A.2d 1075, 1083 (Del. 2001).

[38] *Norton v. K-Sea Transp. P'rs L.P.*, 67 A.3d 354, 360 (Del. 2013).

[39] Dir. Defs.' Opening Br. at 6, 39; Oral Arg. Tr. at 21:3–7.

[40] Plaintiffs do not argue that the addition of the $10.00 dividend triggered *Revlon* scrutiny. *See In re Santa Fe Pac. Corp. S'holder Litig.*, 669 A.2d 59, 70–71 (Del. 1995) (merger involving consideration of 33% cash and 67% stock did not trigger *Revlon* because there is no change of control for *Revlon* purposes where control of post-merger entity remains in "a large, fluid, changeable and changing market").

[41] *Cinerama*, 663 A.2d at 1168.

ways:  by demonstrating that the conflicted director either "controls or dominates the board as a whole" or "fail[ed] to disclose his interest in the transaction to the board and a reasonable board member would have regarded the existence of the material interest as a significant fact in the evaluation of the proposed transaction."[42]

Plaintiffs pursue the second theory, contending that the ValueAct compensation proposal was a material interest, which Haley failed to disclose to the board, and which a reasonable board member would have regarded as significant in evaluating the merger.[43]  In support, Plaintiffs compare this case to *Mills Acquisition Co. v. MacMillan, Inc.*, in which management and their financial advisor gave tips to their preferred bidder and then failed to inform the board.[44]  The Delaware Supreme Court described the failure to disclose the tip as "fraud upon the board."[45]

---

[42] *Id.* (citation and emphasis omitted).  *See also Mills Acq. Co. v. Macmillan, Inc.*, 559 A.2d 1261, 1279–81 (Del. 1989) (applying entire fairness standard of review where insider directors failed to disclose that they tipped off their favored bidder in a way that tainted and manipulated the board's deliberative process); *Weinberger v. UOP, Inc.*, 457 A.2d 701, 707–09, 710–12 (Del. 1983) (applying entire fairness standard of review and determining unfair dealing where two insider directors failed to disclose that they conducted and shared a pricing analysis for the benefit of the acquirer).

[43] Pls.' Ans. Br. at 50–54.  At its core, Plaintiffs' claim for breach of fiduciary duty sounds in fraud.  Such theories enjoy a long history under Delaware law.  For an evocative read contending that policing against fraud on the board is at the heart of all Delaware legal standards, and urging this Court to evaluate all fiduciary duty claims under the lens of fraud, see Joel E. Friedlander, *Confronting the Problem of Fraud on the Board*, The Business Lawyer (forthcoming Winter 2019–2020).

[44] 559 A.2d 1261 (Del. 1986).

[45] *Id.* at 1283.

20

In this case, Plaintiffs argue that Haley's failure to inform the Towers board of the ValueAct proposal constituted deceptive silence and fraud upon the board.[46] Plaintiffs focus on the allegation that Haley viewed the $10.00 dividend as the "minimum" of what stockholders would accept,[47] and that Ubben reported that this amount "[d]idn't trouble him."[48] They contend that but for Haley's undisclosed conflicts and personal interest in seeing the merger through, Haley would have pressed the Willis board for more than the "minimum" of what stockholders would accept.

The facts alleged do not support Plaintiffs' argument. Again, the operative question is whether a reasonable board member would have viewed the ValueAct proposal as significant in evaluating the proposed transaction. Three facts, appropriately alleged or inferred, foreclose an inference that the Towers board would have found the ValueAct compensation proposal significant.

---

[46] Pls.' Ans. Br. at 52–54. From the extensive discovery uncovered from the appraisal action, Plaintiffs point out that Towers director Ray stated during his deposition that he would have wanted to know that Haley discussed compensation at the future company with Ubben and ValueAct. *Id.* at 53 (citing Am. Compl. ¶ 123). This does not satisfy the standard that a reasonable board member would have regarded the existence of the ValueAct compensation proposal as a significant fact in the evaluation of the proposed transaction.

[47] Am. Compl. ¶ 121.

[48] *Id.* ¶ 124.

First, at the time ValueAct made the proposal, the Towers board already knew of Haley's post-merger employment and resulting personal interest in seeing the merger close. It was the board—through Rabbitt—that proposed to Willis that Haley lead the combined entities post-merger. The board knew that Willis agreed to this proposal as of March 19, 2015. The board knew that the combined entities would be much larger and thus would likely generate a much larger salary for Haley. The board was fully informed of this conflict and resulting risk when it empowered Haley to negotiate the transaction.

Second, the Towers board was generally apprised of the negotiations. Haley reported to Rabbitt during the preliminary negotiations, worked with Ganzi during the rounds of negotiations in June, and periodically updated the board on the negotiations. In fact, the Towers board knew that Ubben was agreeable to the $10.00 dividend because Haley shared this information during a board meeting.

Third, ValueAct's compensation proposal was a proposal only. Although it offered greater potential upside to Haley, that upside was based on pie-in-the-sky scenarios and a theory of compensation, not any alleged business plans or projections. To put a fine point on it, according to Defendants, achieving the full $140 million upside of ValueAct's compensation proposal would require Herculean efforts, such as more than doubling the combined entity's market capitalization—

22

from approximately $18 to $40 billion—in three years.[49]  In any event, Haley did not agree to the compensation proposal in September.  Nor did he engage in negotiations over his compensation until after the merger closed.  It was not until March 1, 2016, that the Willis Towers compensation committee formalized an agreement with Haley on compensation.

In the end, the facts alleged do not support a finding of deceptive silence, fraud on the board, or a conflicted negotiator gone rogue.  Given what the Towers board knew and the nature of the ValueAct proposal, Plaintiffs fail to establish that a reasonable director would consider the ValueAct proposal to be significant when evaluating the merger.  Plaintiffs have thus failed to show that the merger is subject to the entire fairness standard of review based on the ValueAct compensation proposal.

### 2. Plaintiffs have not stated a claim for breach of fiduciary duty under the business judgment rule.

Applying the business judgment rule insulates the merger from all attacks other than on grounds of gift or waste.[50]  "[T]he doctrine of waste is a residual

---

[49] *See* Dir. Defs.' Reply Br. at 10 (citing Aronstam Aff. Ex. E).

[50] *In re KKR Fin. Hldgs. LLC S'holder Litig.*, 101 A.3d 980, 990 (Del. Ch. 2014), *aff'd sub nom.*, *Corwin v. KKR Fin. Hldgs. LLC*, 152 A.3d 304 (Del. 2015); *see also Marciano v. Nakash*, 535 A.2d 400, 405 n.3 (Del. 1987) ("[A]pproval by fully-informed disinterested directors under section 144(a)(1), or disinterested stockholders under section 144(a)(2), permits invocation of the business judgment rule and limits judicial review to issues of gift or waste with the burden of proof upon the party attacking the transaction.").

23

protection for stockholders that polices the outer boundaries of the broad field of discretion afforded directors by the business judgment rule."[51]  "The test to show corporate waste is difficult for any plaintiff to meet; indeed, '[t]o prevail on a waste claim . . . the plaintiff must overcome the general presumption of good faith by showing that the board's decision was so egregious or irrational that it could not have been based on a valid assessment of the corporation's best interests.'"[52]

Plaintiffs do not expressly apply the waste standard in the Amended Complaint or briefing, but "[a] claimant need not necessarily expressly aver 'gift' or 'waste' in order to make out a claim on these theories[,] [s]o long as claimant alleges facts in his description of a series of events from which a gift or waste may reasonably be inferred . . . ."[53]

Plaintiffs direct their arguments to the non-exculpated claim standard.  To state a claim against the director defendants who are protected by an exculpatory provision, Plaintiffs must plead facts supporting a rational inference that the directors "harbored self-interest adverse to the stockholders' interests, acted to

---

[51] *Sample v. Morgan*, 914 A.2d 647, 669 (Del. Ch. 2007).

[52] *In re Citigroup Inc. S'holder Deriv. Litig.*, 964 A.2d 106, 136 (Del. Ch. 2009) (quoting *White v. Panic*, 783 A.2d 543, 554 n.36 (Del. 2001)).  "If given the facts pled in the complaint, 'any reasonable person might conclude that the deal made sense, then the judicial inquiry ends." *In re Lear Corp. S'holder Litig.*, 967 A.2d 640, 656 (Del. Ch. 2008).

[53] *Michelson v. Duncan*, 407 A.2d 211, 217 (Del. 1979).

24

advance the self-interest of an interested party from whom they could not be presumed to act independently, or acted in bad faith."[54]

Aside from Haley, Plaintiffs concede that the director defendants were disinterested with respect to the transaction, and they do not meaningfully contend that the director defendants could not be presumed to have acted independently from any interested party. Plaintiffs appear to argue that the director defendants nevertheless acted in bad faith. "[B]ad faith will be found if a 'fiduciary intentionally fails to act in the face of a known duty to act, demonstrating a conscious disregard for his duties.'"[55] "In the transactional context, a very extreme set of facts would seem to be required to sustain a disloyalty claim premised on the notion that disinterested directors were intentionally disregarding their duties."[56]

While "[t]he standards for corporate waste and bad faith by the board are similar[,]"[57] the former is not necessarily a lesser-included act of the latter. That is,

---

[54] *In re Cornerstone Therapeutics Inc., S'holder Litig.*, 115 A.3d 1173, 1179–80 (Del. 2015).

[55] *Lyondell Chem. Co. v. Ryan*, 970 A.2d 235, 243 (Del. 2009) (citing *In re Walt Disney Co. Deriv. Litig.*, 906 A.2d 27, 67 (Del. 2006)).

[56] *Lear*, 967 A.2d at 654–55 (citation omitted).

[57] *Panic*, 783 A.2d at 554 n.36. *Compare Brehm v. Eisner*, 746 A.2d 244, 263 (Del. 2000) (defining corporate waste as "an exchange of corporate assets for consideration so disproportionately small as to lie beyond the range at which any reasonable person might be willing to trade"), *with In re J.P. Stevens & Co., Inc. S'holders Litig.*, 542 A.2d 770, 780–81 (Del. Ch. 1988) (identifying bad faith by "assessing whether that decision is so far beyond the bounds of reasonable judgment that it seems essentially inexplicable on any ground other than bad faith").

25

"it is not necessarily true . . . that every act of bad faith by a director constitutes waste."[58]  This decision need not dilate on the distinctions between the two legal theories, or their respective applicability in the context of this analysis, because Plaintiffs have not adequately alleged bad faith.

To show that the director defendants acted in bad faith, Plaintiffs focus on the board's oversight of Haley during the merger negotiations, and specifically during the five-month interim period leading up to Haley's renegotiation of the special dividend.  To be clear, Plaintiffs acknowledge that "[t]here is nothing inherently wrong with allowing an interested CEO to negotiate a transaction."[59]  They further admit that the Towers board acted consistently with their fiduciary duties during the initial phase of merger negotiations.[60]  Plaintiffs contend, however, that with respect to the interim period, the Towers board took a dramatically different approach, by "abdicat[ing] its fiduciary duties by failing to oversee Haley 'creat[ing] the atmosphere in which' Haley 'could act [] freely and improperly.'"[61]  The board's failures were especially egregious, Plaintiffs allege, because stockholders like

---

[58] *In re Walt Disney Co. Deriv. Litig.*, 907 A.2d 693, 749 (Del. Ch. 2005), *aff'd*, 906 A.2d 27 (Del. 2006).

[59] Pls.' Ans. Br. at 61 (emphasis omitted) (quoting *Alidina v. Internet.com Corp.*, 2002 WL 31584292, at *7 (Del. Ch. Nov. 6, 2002)).

[60] *Id.* at 4 (conceding that the Towers board's decision to "let Haley be the sole negotiator when initially putting together the Merger" was "likely not bad faith conduct under Delaware law").

[61] *Id.* (quoting *Mills*, 559 A.2d at 1284 n.32).

Driehaus openly complained about Haley's supposed adverse incentives in connection with the transaction.[62]

Several facts appropriately before the Court undermine Plaintiffs' abdication theory. Namely, the board was aware of Haley's future employment with the combined company when it delegated authority to Haley,[63] the Towers directors attended meetings between Haley and Willis,[64] and the board met to discuss the transaction before approving the initial transaction and the renegotiated terms.[65] Plaintiffs quibble with the scope of the Towers board's involvement, noting that the board did not attend many of the negotiations between Haley and Willis, did not know of the compensation proposal, and did not meet between June 28 and November 17, 2015.[66] Still, these failures are a far cry from "abdication," and undercut Plaintiffs' ability to show the "extreme facts" necessary to demonstrate that disinterested directors acted disloyally.

Plaintiffs' reliance on *Alidina v. Internet.com Corp.* is misplaced.[67] In *Alidina*, the target company's CEO conditioned the sale of the company on his

---

[62] *See id.* at 56 (citing Am. Compl. ¶ 114).

[63] *See* Am. Compl. ¶¶ 3, 13, 50, 55.

[64] *See* Proxy at 75.

[65] *See* Am. Compl. ¶¶ 54, 70–72, 123.

[66] *See* Dir. Defs.' Opening Br. 41, 43–47; Pls.' Ans. Br. at 54–66; Dir. Defs.' Reply Br. 9–12, 14–15, 19–20, 25–26.

[67] 2002 WL 31584292, at *1 (Del. Ch. Nov. 6, 2002).

ability to purchase a controlling interest in a wholly-owned company subsidiary.[68] In this case, Plaintiffs do not allege that Haley discussed compensation contemporaneous with merger negotiations, much less that he conditioned the merger on execution of a contract favorable to him. In *Alidina*, the board ceded complete control over the negotiations to the CEO.[69] In this case, Plaintiffs cannot allege wholesale abdication, as discussed above. In *Alidina*, the CEO negotiated the "agreed upon" value of the subsidiary down by 25%, thereby securing for himself a lower per share purchase price for the controlling stake in the subsidiary.[70] In this case, Haley increased the special dividend by over 100%.[71]

Separately, Plaintiffs contend that the director defendants acted in bad faith by issuing disclosures that the directors knew omitted a material fact.[72] According to Plaintiffs, the Towers board knew that Haley and Ubben renegotiated the merger consideration in a "singular exchange,"[73] but failed to disclose this to stockholders, and instead implied that the board supervised Haley through an arm's-length

---

[68] *See id.* at *2–3.

[69] *Id.* at *8.

[70] *Id.* The board approved the sale of the controlling interest in the subsidiary despite a third-party consultant previously giving the subsidiary a value more than 50% higher than the ultimately negotiated value.

[71] *Compare* Am. Compl. ¶ 67, *with id.* ¶ 126.

[72] Pls.' Ans. Br. at 66–67.

[73] *Id.* at 45, 66; *see also* Am. Compl. ¶ 164 ("Haley informed the Towers Board about material decisions after-the-fact.").

negotiation.[74]   Plaintiffs, however, plead no facts to suggest that the omitted information should have been disclosed[75] or that the board acted with "'intentional' dereliction or a 'conscious disregard' of duty" in omitting that information.[76]

In sum, the Amended Complaint does not plead facts necessary to establish a "reasonably conceivable bad-faith claim[,]" against the majority of Towers's board.[77]  Because Plaintiffs fail to state a non-exculpated claim of bad faith against the director defendants, they also fail to state a claim under the "onerous"[78] and "exacting"[79] test for waste.  As a result, Plaintiffs' claim for breach of fiduciary duty against the director defendants is dismissed.[80]

---

[74] Am. Compl. ¶¶ 164–65.

[75] Plaintiffs do not explain how this omission would significantly alter the total mix of information made available to Towers's stockholders. *Nguyen v. Barrett*, 2016 WL 5404095, at *3 (Del. Ch. Sept. 28, 2016) ("Information is material if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote; or, in other words, if, from the perspective of a reasonable stockholder, there is a substantial likelihood that it significantly alters the total mix of information made available." (citation and internal quotation marks omitted)).

[76] *Id.* at *6 (quoting *Lyondell*, 970 A.2d at 243).

[77] *MeadWestvaco*, 168 A.3d at 684.

[78] *In re Walt Disney Co. Deriv. Litig.*, 906 A.2d 27, 74 (Del. 2006); *see also Hills Stores Co. v. Bozic*, 769 A.2d 88, 110 n.74 (Del. Ch. 2000).

[79] *In re infoUSA, Inc. S'holders Litig.*, 953 A.2d 963, 1002 (Del. Ch. 2007).

[80] Because Plaintiffs have not stated a claim challenging the transaction as the product of wrongdoing, Plaintiffs' Count I for breach of fiduciary duty against Haley alone is also dismissed.

29

## B. Aiding and Abetting

To state a claim for aiding and abetting in breach of fiduciary duty, a complaint must adequately allege an underlying breach.[81] Because the Amended Complaint fails to state a claim for breach of fiduciary duty, Count III for aiding and abetting is dismissed.

## III. CONCLUSION

For all of these reasons, the Amended Complaint is dismissed in its entirety.

**IT IS SO ORDERED.**

---

[81] *Santa Fe*, 669 A.2d at 72 ("A claim for aiding and abetting requires the following three elements:  (1) the existence of a fiduciary relationship, (2) a breach of the fiduciary's duty, and (3) a knowing participation in that breach by [the non-fiduciary]."). *See also RBC Capital Mkts., LLC v. Jervis*, 129 A.3d 816, 861–62 (Del. 2015).